No. 50.—Joseph L. Terry and others, plaintiffs in error, *vs.* W. Buffington and another, propounders, &c. defendants in error.

[1.] Testamentary capacity is to be determined by the condition of the testator's mind at the time of his executing or acknowledging the will.

[2.] For the purpose of shedding light upon the state of the testator's mind when the will was made, evidence of its condition, both before and after the period, may be produced.

[3.] As an independent fact, proof of incapacity at one period, is inadmissible to impeach a will made at another.

[4.] When testimony has been introduced, showing that the testator's mind was the same when the will was made that it was at a subsequent period, when he was found to be *non compos mentis*, proof of his incapacity at the latter period, is relevant and proper to attack the will.

VOL XI 43

[5.] When insanity is once found, upon an inquisition of lunacy, it is presumed to continue; and the *onus* is cast upon those offering a will, to show that the disqualification has been removed.

[6.] When it is apparent that justice *may* have been defeated by the misapprehension of the facts or the law, by the Court, in its charge to the Jury, the error calls for correction, as a matter of right.

[7.] If, taking all the instructions collectively, the law seems to have been properly expounded to the Jury, the judgment will not be reversed, though some one opinion may be erroneous.

The correctness of a charge must be determined by the whole, taken together.

[8.] Fraud is a distinct head of objection to the validity of a will, from importunity and undue influence; usually they are the very opposites of each other. Both are equally destructive of the validity of a will.

[9.] By the Statute Law of some of the States, when insanity of the testator is alleged, the inquiry must always be, whether, at the time of executing or acknowledging the will, the testator was capable of making a valid *deed* or *contract; and no inferior grade of intellect will suffice;* but such is not the rule of the Common Law, nor in Georgia.

[10.] The right to the free enjoyment and disposition of one's property, is required by the best interests of society.

[11.] The phrase, "a mere glimmering of reason," used in *Potts and others vs. House,* (6 *Ga. Rep.* 324,) explained and illustrated.

[12.] It is the duty of the *Courts* to administer *justice* according to *law,* and it is irregular and improper to call upon counsel to waive any legal right, in the presence and hearing of the Jury, who are charged with the case.

Caveat to will, on appeal in Elbert Superior Court. Tried before Judge BAXTER, March Term, 1852.

This was a caveat to the will of William Ward, deceased. The grounds of caveat were, 1st. Insanity; 2d. Undue influence; 3d. Fraudulent representations and practices on the part of the principal legatee in the will.

The will was dated 1st day of June, 1844. Much evidence was introduced on both sides, which it is unnecessary to be here repeated. After all the evidence was introduced, counsel for caveators proposed to prove by Dr. Edwin A. Jones, "that, as a physician, he examined deceased in November, 1849, and that, at that time, he was, from old age, or some other cause,

totally deprived of reason—being, as witness would term him, idiotic;" caveator having previously proven that the condition of the deceased at that time was the same that it was in 1844, when the pretended will was executed. The Court rejected the evidence of Dr. Jones, on the ground that it was too remote; which decision is the first ground of error assigned.

Counsel for caveators also offered in evidence, the record of a commission of lunacy, with the proceedings under it, in November, 1849, by which Wm. Ward was found to be an idiot and insane. The Court rejected this evidence also, (certifying that the result of the finding was not announced to the Court,) and this is assigned as error.

The Court charged the Jury, that "the probate of the will was resisted on three grounds, (naming them as above;) but that the last two, (undue influence and fraud) amounted to the same thing—but that the Jury might understand him fully, he had written down his charge as follows:

"You have two of the most difficult questions to determine, that can be submitted to the consideration of a Jury for their decision. Such is the peculiar character of the human mind—such is the difference in the intellectual powers of man—it is difficult to determine when capacity ceases and incapacity begins. What constitutes a sufficient capacity to make a will? If the testator, at the time he makes his will, has any mind; is not an idiot or lunatic; if his mind is not totally eclipsed; if it is not entirely extinguished; he has sufficient capacity to make a will. No imbecility, eccentricity, incapacity to make contracts, or extreme old age, unless the mind has become extinct from age, are sufficient to set aside a will. If you think the testator had not sufficient capacity, according to the above rule, then you ought to declare, by your verdict, that the will propounded, is not the last will and testament of William Ward. But if you believe from the evidence, that William Ward had, at the time he made this will, sufficient capacity; by the same rule then, you ought to declare the paper propounded is the last will and testament of William Ward; unless you be-

lieve the will of William Ward was obtained by improper influences.

"To constitute improper influence, it must amount to moral coercion. It is constraining a man to make a will, contrary to his wishes, by excessive importunities, threats, fear, deceit, fraud or misrepresentations, whereby such control is acquired over the testator, as deprives him of his free agency, and constrains him to make a will contrary to his wishes. It is not improper to pursuade, to appeal to the affections or understanding of the testator to make a will. The influence acquired over a testator by kindness or affection, is not improper. Thus, if you believe, from the testimony, that William Ward's will was obtained by improper influence or fraudulent practices, then you ought to declare the paper propounded is not the last will and testament of William Ward. But if you believe it was not obtained by improper influence or fraudulent practices, then you ought to declare it the last will and testament of William Ward."

On which charge, error has been assigned:

1st. Because the Court should have told the Jury, there must be mind acting regularly, and the will should be the emanation and result of that mind, in order to be set up.

2d. The Court erred in saying that "undue influence amounting to moral coercion, and fraudulent representations and practices in obtaining the will, amounted to the same thing, and that the latter must amount to moral coercion."

3d. That the charge in reference to these two last grounds is confused and calculated to perplex and bewilder the Jury.

4th. That the charge nowhere presents fairly to the Jury, the 3d ground of caveat, viz: fraudulent misrepresentations and practices.

After the Jury retired, one of their body returned and asked the Court, *privately*, to send out to them his written charge aforesaid. Whereupon, the Court inquired of the counsel, on both sides, *publicly*, if they would consent. Counsel for caveators remarked that it was irregular, and they could not consent; whereupon, counsel for propounder said, "we are per-

fectly willing on our side." The Court then sent word by the Juror, that they could not get his charge.

Which proceeding by the Court is assigned as error.

T. R. R. Cobb, for plaintiff in error.

W. T. Van Duzer, for defendant in error.

*By the Court.*—Lumpkin, J. delivering the opinion.

This case comes up on a writ of error, from the Superior Court of Elbert County, on exceptions taken at the trial of issues which came before that Court, on appeal from the Court of Ordinary of the same County, upon a caveat against the admission to probate of a certain instrument of writing, purporting to be the will of William Ward.

There are several bills of exception; some to the rejection by the Court of evidence offered on the part of the caveators, to impeach the validity of the instrument; others to a series of instructions given by the Court to the Jury, after the testimony was closed; and one to the alleged misconduct of the presiding Judge, after the Jury were charged with the case, and had retired to their room.

The first question we are called upon to decide, is as to the competency of the testimony of Dr. Edwin A. Jones. The witness examined the testator, as a physician, in November, 1849, and swore, that at that time, from old age, or some other cause, he was totally deprived of reason—"being what he would term an idiot." It was previously proven, that his mental condition at that time was the same that it was in 1844, when the will was made. The evidence was objected to and excluded by the Court, on the ground that it was too remote.

[1.] The general principle will not be controverted, that the state of mental capacity is to be determined by the condition of the testator's mind, at the time of his executing or acknowledging the will. For notwithstanding his incapacity at a prior or subsequent time should be proved, it does not necessarily

follow, that he was incompetent, when the will was made ; especially if the incapacity be subsequent to the execution of the instrument.

[2.] And notwithstanding, it may be true, that for the purpose of shedding light upon the state of the testator's mind when the will was made, evidence of its condition, both before and after that period, may be produced :

[3.] Still as an insulated point, we should unhesitatingly hold that proof of the imbecility of William Ward in 1849, was inadmissible to impeach a will made by him in 1844.

[4.] But here it had been already established, that the state of the testator's mind was the same in 1844, and before and after that date, that it was in 1849. This laid the foundation for the introduction of Dr. Jones' testimony. For if the testator was *non compos mentis*, in 1849, and his mind was in the same condition in 1844, when the will was made, then it follows irresistibly that the testator was incapable of disposing of his estate, when the instrument was executed. *Per se*, the proof was objectionable ; taken in connexion with the other evidence, it was relevant and proper.

[5.] We are not prepared to rule that the inquisition of lunacy, found in 1849, stands upon the same footing. Had the insanity of the testator been legally established before the will was made, its continuance would have been presumed, and the *onus* cast upon the propounders of the will, to show that the disqualification had been reversed. The maxim is, *semel furibundus semper furibundus praesumitur*. The converse of the proposition, however, or the doctrine of relation back, does not hold in such cases. The strongest objection, perhaps, to the admissibility of this judgment of lunacy is, that it is *res inter alios acta*. The record does not disclose that the propounders of the will were parties or privies to that proceeding.

[6.] As to the objections made to the instructions of the Court, we admit that they were not so perspicuous, perhaps, as they might have been. The duty of summing up, especially where the facts are numerous and complicated, as in the present case, is often difficult to discharge. It is scarcely possi-

ble for the most enlarged and experienced mind, in the " noise and confusion" of a *nisi prius* trial, to recapitulate and group together all the testimony for and against, and to lay down with precision the principles of law applicable to the facts. And when it is apparent that justice *may* have been defeated by the misapprehension of the proof or the law, by the Court, the error calls for correction as a matter of right.

[7.] If, however, taking all the instructions collectively, the law seems to have been properly expounded to the Jury, the judgment will not be reversed, though some one opinion may be erroneous.   3 *Gill. and Johns.* 450.    6 *Harr. & Johns.* 57.    7 *Ib.* 147.

[8.] Now it is conceded that *fraud* is a different head of objection to the validity of a will, from importunity or undue influence.   Indeed they are usually the very opposites of each other.   In the one case the party is induced by imposition to do willingly the act which he performs.   The mind of the testator being poisoned by the fraudulent practices which have been resorted to, so far from having his free agency controlled, he delights to use the power which he has, to cut off near and dear relations—a wife or children for instance—having the strongest natural claims upon his affection.   He glories in the act, however absurd, unjust and unreasonable.

Not so with a person who has come under the power or dominion of another, and whose firmness has at last reluctantly yielded through fear, until he is made to do that which his judgment and will, if free and unconstrained, would instantly repudiate.

Fraud and importunity are equally destructive of the validity of a will made under their influence.   And so the Judge, in substance, instructed the Jury, in the conclusion of his charge, the whole of which must be taken together.

It is a curious fact and one worth noting, that in the speeches of Isaeus, the master of Demosthenes, ten out of sixty-four having been preserved, and which are the most ancient monuments extant of the kind, the orator urges the claim of

kinship and blood; and hurls the bitterest reproaches against the *frauds* suggested in the procurement of wills.

It is contended that the Court should have told the Jury, upon the question of insanity, that there must be mind acting regularly; and the will, in order to be set up, should be the emanation or result of that mind.

After the somewhat elaborate *treatise* on wills, published by this Court in 1849, for which *Potts and others vs. House,* was the text, or as some may have supposed, rather the *pre*-text, we had thought that we should not be called on again for an exposition of the phrase, " sound and disposing mind and memory." How vain the hope for any Court to entertain, that principles of law can be so stated as to bid defiance to the astuteness of counsel, against whose clients these principles operate. For myself I am free to confess that I utterly despair of ever furnishing a " *supplement*" which will materially improve, much less supplant the original *work,* to which I have referred.

[9.] We have no other standard in Georgia, by which the mental capacity of a testator is to be measured than that supplied by the Common Law. By the legislation of some of the States, the inquiry must always be, whether, at the time of executing or acknowledging the will, the testator was capable of making a valid *deed* or *contract; and no inferior grade of intellect will suffice.* Such, however, is not the rule here. Persons of *unsound* mind are not permitted to make wills; because, as the law makes a just *post mortem* disposition of the estates of intestates, it is deemed safer that the property of such persons should, like the estates of minors, under a certain age, be distributed by law, rather than by the ostensible act of those who are necessarily the dupes of their imbecility or credulity.

[10.] The most sound and reflecting minds agree, nevertheless, that the right to the free enjoyment and disposition of one's property, is required by the best interest of society, and it will be found that the sacredness of the right has been guaranteed and guarded in exact proportion with the advancement of civilization in the world.

[11.] In *Potts and others vs. House,* (6 *Ga. Rep.* 324,) the

doctrine was stated as deducible from  the  authorities, that  " *a mere glimmering of reason*" was sufficient to sustain a will.    We have been requested—nay, importuned—to explain what was to be understood by this language ;  and we are assured that it has been grossly misapprehended and perverted.    The meaning we sup-pose to be this:

Testaments  of chattels might, at Common Law, and by the laws of this State, be made by infants of the  age of  fourteen, if males, and twelve, if females.    This was the English rule until the Statute of I. Victoria, by which the testamentary power of in-fants is abolished.    It is the rule  here still.'   This, by way of illustration, we  will designate as the morning dawn  of reason, or the break of day of the·mind, in  legal  contemplation.    It continues to unfold and expand until it culminates  to the  me-ridian blaze of noon, when no suspicion is  entertained  of the competency and freedom to act of the testator.    It then  begins to go down until its disk disappears beneath the horizon.    Still, there is the mellow  glow of twilight, by which the  testator  is enabled to comprehend the contents .of his will—the  nature of the estate he is conveying  to his family  connexion—their  rela-tive situation to  him—the  terms  upon  which he stands with them—his own situation, and the circumstances which surround him.    These and like objects, although seen by the  testator  as through a glass dimly, by reason of the infirmity of age, or  oth-er causes, are still  contemplated, not by the flashy, fitful and evanescent  glare  of  the  *aurora  borealis ;*  but  the  steady, though subdued light and illumination  of the  " glorious  king of day," although disrobed of his  gorgeous and  dazzling beams.    The  *animus testandi*, the soul of a will,  animates  the form of the instrument which he has executed.

[12.]  As to the complaint against the Court, for  calling  up-on counsel in the presence and hearing of one of the  Jurors, to know whether they were willing  for the written instructions  to be sent out to the Jury  after  they were charged  with the  case and had retired to their room, we would  remark, generally, that it is irregular and improper for the Court to call upon counsel, in the presence of the Jury, *to waive any legal  right  whatever*.    It

is the duty of the *Court* to administer *justice,* according to *law.* *Berry. vs. The State,* 10 *Ga. Rep.* 371.

Either the Court should have delayed making the call until the Juror had retired, and if necessary have dismissed him from its presence for that purpose; or what would have been better, the whole Jury should have been brought back into the box, and the charge reiterated to them, in the presence of the parties or of their counsel.

While we would not reverse the judgment, and direct a new trial on account of this irregularity, we cannot suffer it to pass without condemning the practice.