## ALCORN v. ALCORN et al.

### (Circuit Court, N. D. Mississippi, W. D. December 4, 1911.)

### No. 434.

1. DEEDS (§ 196*)—FRAUD OR UNDUE INFLUENCE—BURDEN OF PROOF.

One suing to cancel a deed has the burden to show that its execution was induced by fraud or undue influence, including, as elements of fraud, falsity of representations made to the grantee by the grantor, knowledge by the grantee of their falsity, intent by him to deceive, and grantor's reliance on the representations to his damage.

[Ed. Note.—For other cases, see Deeds, Cent. Dig. §§ 587–593; Dec. Dig. § 196.*]

2. CONTRACTS (§ 99*)—TRANSACTIONS BETWEEN PARENT AND CHILD—BURDEN OF PROOF.

Contracts and business dealings between parent and child are not per se fraudulent, and must be treated as transactions between other persons, and, where the bona fides thereof is attacked, fraud must be clearly proved.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 448–453; Dec. Dig. § 99.*]

3. DEEDS (§ 196*)—EXECUTION—UNDUE INFLUENCE—BURDEN OF PROOF.

In an action to set aside a deed from a parent to a child, the burden is on complainants to show that defendant exercised undue influence over grantor overcoming grantor's will, and it must appear that the undue influence was exercised when the deed was executed.

[Ed. Note.—For other cases, see Deeds, Cent. Dig. §§ 587–593; Dec. Dig. § 196.*]

4. DEEDS (§ 211*)—EXECUTION—UNDUE INFLUENCE—EVIDENCE—SUFFICIENCY.

In an action to set aside a deed from a parent to a child, evidence held insufficient to show that defendant secured the deed by fraud or undue influence.

[Ed. Note.—For other cases, see Deeds, Cent. Dig. §§ 637–647; Dec. Dig. § 211.*]

5. DEEDS (§ 72*)—EXECUTION—UNDUE INFLUENCE—REQUISITES.

Undue influence, to avoid a deed, must be unlawful or fraudulent influence controlling grantor's will, and does not comprehend the natural affection, confidence, and gratitude of a parent, unless such influence is used to confuse his judgment and control his will.

[Ed. Note.—For other cases, see Deeds, Cent. Dig. §§ 190–199; Dec. Dig. § 72.*]

In Equity. Bill by Mrs. Amelia W. Alcorn against May Yates Alcorn and another, revived by E. W. Rector and others, executors on complainant's death. Decree for defendants.

J. W. Cutrer and R. H. Thompson, for complainants.
Calvin Perkins and Jas. H. Watson, for defendants.

NILES, District Judge. Mrs. Amelia W. Alcorn originally brought this suit individually and as executor and trustee under the will of James L. Alcorn, deceased, in the chancery court of Coahoma county, Miss., to annul a deed executed by her on October 14, 1895, by the terms of which she conveyed to her son, James Alcorn, reserving to herself a life estate, the remainder in fee, to Eagle's Nest planta-

tion, which had theretofore passed to her under the will of her husband, James L. Alcorn (hereinafter called Gov. Alcorn), who died December 19, 1894.

The original bill in this cause was filed March 30, 1905, in the said chancery court of Coahoma county, Miss., and at the return term of said court, on account of the diverse citizenship of the parties, on petition of the defendants, was removed to this, the United States Circuit Court for the Western Division of the Northern District of Mississippi.

The original complainant, Mrs. Amelia W. Alcorn, died in November, 1907, leaving a will by which she devised the said Eagle's Nest plantation, share and share alike, to her daughters, Mrs. Rosebud Rector, Mrs. Gertrude Russell, Mrs. Justina Swift, Angelina Alcorn, now Angelina Corley, and James L. Alcorn, defendant herein, the son of James Alcorn, who died November 30, 1898, leaving surviving him his widow, the defendant May Yates Alcorn, and a minor child, the said James L. Alcorn.

A short time after the death of Mrs. Amelia W. Alcorn, on a bill of revivor filed by her daughters and her executors, Messrs. E. W. Rector, P. B. Russell, and W. A. Glover, the cause was revived, and now stands in their names as complainants.

The relationship of the parties to this suit is as follows: Gov. Alcorn was the husband of Amelia W. Alcorn. The issue of this union was the four daughters, Mrs. Rector, Mrs. Russell, Mrs. Swift, Angelina Alcorn, and James Alcorn (the only son), who died in November, 1898, leaving a widow, May Yates Alcorn, and a minor son, James L. Alcorn, the grandson of Gov. Alcorn and Mrs. Amelia W. Alcorn.

The property involved in this litigation is Eagle's Nest plantation, a valuable body of land in Coahoma county, Miss., upon which is situated the family residence erected by Gov. Alcorn, and known as the Eagle's Nest mansion house.

By her original bill, complainant sought cancellation of the deed of October 14, 1895, by which she conveyed the said Eagle's Nest plantation to her son James Alcorn, deceased, reserving to herself a life estate, upon the following grounds: (1) That under the terms of the will of Gov. Alcorn, the property had been devised to her for the equal benefit of their children, in the form of a "precatory trust." (2) That this deed of October 14, 1895, had been secured by her son, the said James Alcorn, deceased, in an "unconscionable manner," and by "absolutely unfounded and fraudulent representations," and by the "overpowering and dominating influence exercised over her by her said son."

The first ground relied upon by complainant for cancellation of said deed was not presented on argument, nor is it now presented for the consideration of the court, because of the decision of the Supreme Court of Mississippi in the case of Rector et al. v. Alcorn, 88 Miss. 788, 41 South. 370, to the effect that:

"From an examination of the entire will of Gov. Alcorn, we do not take the view that the words in reference to Mrs. Alcorn are precatory."

Complainant's first ground of relief having been thus eliminated, the issue is narrowed to the sole contention that *James Alcorn, de-*

*ceased, secured the deed of October 14, 1895, from his mother, Mrs. Amelia W. Alcorn, by false and fraudulent representations, and by the exercise of undue influence.*

The defendants, answering, deny each and every allegation of the bill.

In this case a picture is presented wherein fraud and undue influence go hand in hand, interwoven and blended, and whose light and shadows vividly portray the defenseless citadel of a mother's heart stormed by a crafty, avaricious, and thankless son, armed with a great two-edged sword, "sharper than a serpent's tooth," and wielded with a bold, merciless cruelty, shocking to the sensibilities and proclaiming the monster.

There is a reverse side, however, upon which is painted the fond old mother, glorified with the beautiful qualities and attributes of a mellow age, one whose lines had been cast in pleasant places, who had been the life partner of a distinguished lawyer, soldier, and statesman, leaving an indelible impress upon his state and country's history, a man whose heart had been ever overflowing with attachment to his family circle, though never attempting to conceal his boundless affection and extreme partiality for his only son, James. Though cold in death, the tender attestation of this overwhelming affection speaks through his will with a solemnity and pathos which can but touch the heart:

"My son James has treated me with great affection, and I love him with deep affection, and I request my wife, Amelia, to whom I bequeath my estate, shall treat him with the favoritism and partiality which I well know her heart inclines her to do."

So well was this message heeded that, as long as this favorite child and son *lived*, he was the idol of his mother's heart.

[1] We are confronted at the outset of the consideration of this question by the "twin influences" (if I may so term them) brought to bear to secure this deed—fraud and undue influence. Are they so blended as to be separated?

"In strictness 'undue influence' and 'fraud' are distinguishable. In one case, the mind of the testator is so overmastered that another will is substituted for his own. In the other, he is, in a sense, a free agent, but is deceived into acting upon false data." Terry v. Buffington, 11 Ga. 337, 56 Am. Dec. 423.

But more often is it a mere question of a choice of terms. Ginter v. Ginter, 79 Kan. 721, 101 Pac. 634, 22 L. R. A. (N. S.) 1024.

It is elementary that fraud is never presumed, but must be affirmatively proven. The presumption, if any, is in favor of innocence, and the burden falls on him, who asserts "fraud," to establish it by "proving every material element" of the cause of action by a "preponderance of evidence." Thus the burden rests on him to prove the falsity of the representations, the scienter, the intent to deceive, and his reliance on the representations to his damage. 20 Cyc. 108, J, with authorities cited.

It is equally true that, where one seeks to establish undue influence in order to set aside a will or conveyance, the burden of proof is on

him.  Mallow v. Walker, 115 Iowa, 238, 88 N. W. 452, 91 Am. St. Rep. 158.

Further, under this authority it is stated that:

"Where one seeks to set aside a conveyance on the ground of undue influence, the evidence must show the influence so great as to overcome the will of the grantor or testator.

"It must show that the undue influence was exercised at the time the act referred to was done.

"That the deed was executed by reason of the influence resulting from affection is insufficient if the free agency of the testator or grantor be not impaired.

"That the distribution made by a testator of his property among his children by deed, is unreasonable or unjust does not alone establish undue influence."

[2] These principles are of universal application as applied to fraud and undue influence aside from that connected with fiduciary relations, such as hold in the instant case, and counsel for complainant aptly quotes that broad and beneficent doctrine of equity applying to fiduciary relations as based on the highest morality; and that the court "will not allow any transaction between the parties to stand, unless there has been the fullest and fairest explanation and communication of every particular resting in the breast of the one who seeks a contract with the person so trusting him; and that this doctrine not only applies to that of parent and child, but extends to the entire field of confidential relationship."  And especially as regards parent and child, equity scrutinizes and "weighs in golden scales" every transaction between them which includes, or consists of, a benefit secured by the superior from him who occupies the condition of dependence.

Counsel also recognizes the doctrine, as announced by the same high authority (3 Pomeroy, Eq. J. [3d Ed.]), that: .

"It is impossible to formulate a single definition which shall embrace all forms and phases of undue influence; each case must largely depend upon its own circumstances."

In applying the latter principle, it should not be overlooked that contracts and business dealings between parent and child are not per se fraudulent, but they must be treated just as are transactions between other persons, and, where the bona fides of their transactions are attacked, the fraud must be clearly proved.  29 Cyc. 1657, A, with authorities cited.

[3] This being an action to set aside a deed from a parent to a child: (1) The burden of proving undue influence is on the complainants.  (2) The evidence must show that the influence was such as to overcome the will of the grantor and to "destroy her free agency," and it must appear that the "undue influence was exercised at the time the act referred to was done." 39 Cyc. 1658.

[4] It is not necessary to discuss and review in detail the testimony in this case, and the events leading up to the unhappy differences between the members of this family, parties litigant to this suit.

From a careful reading of the testimony and hearing argument of counsel, unusually interesting. and able, the court is of opinion that Mrs. Alcorn, at the time she deeded Eagle's Nest plantation to her

son James, reserving to herself a life estate therein, was in full possession of her unusually bright mentality, and thoroughly understood and appreciated her position; that the idea of undue influence is completely dissipated by the fact that she had the benefit of counsel, who prepared the prior contract of date July 20, 1905, and was present at the execution of the deed, of date October 14, 1895, both in the capacity of complainant's counsel and her friend—indeed, closer than a friend, being related to her by marriage—and that Mrs. Alcorn's daughters were fully acquainted with its terms.

Mrs. Alcorn at that time was endowed not only with those feminine graces and accomplishments which had enabled her to shine resplendently as mistress of Eagle's Nest, but took a keen interest in everything going on about her, and, from the death of her illustrious husband to that of her son James, constantly availed herself of advice in respect to the management of her estate, discussing her affairs freely with the members of the family, other relatives and friends, including one of her sons-in-law, a lawyer of distinction whom she visited and who visited her frequently, and with whom she maintained correspondence, receiving the benefit from him of a broad experience and a trained legal mind.

In July, 1895, Mrs. Alcorn entered into a contract and agreement to convey Eagle's Nest plantation to her son James, reserving to herself a life estate, under the terms of which certain benefits and advantages would accrue to her should James fulfill his obligations as fully set forth therein. This contract and agreement was drawn by counsel heretofore referred to, acting for both parties. In pursuance of this prior contract and agreement, Mrs. Alcorn directed her attorney to prepare the deed of conveyance of October 14, 1895.

Is it reasonable to consider Mrs. Alcorn, under the conditions outlined, as being so *overmastered* that *another mind* was *substituted for her own,* or that while she was, in a sense, a free agent, she was *deceived* into *acting* upon *false data?* Does it not seem more natural and probable that, after entering into the preliminary agreement to deed the property to her son upon his complying with the obligation therein stipulated, he *did* comply therewith, or substantially so, or in a manner entirely satisfactory to her, and in full knowledge of all the facts as explained to her by her son and her son-in-law, the latter acting as her attorney in this matter, *Mrs. Alcorn freely, voluntarily, and willingly signed the conveyance?*

Upon the proof, Gov. Alcorn's estate owed debts at his death of some magnitude, that two years prior to his decease his planting operations had not been successful, and that the outlook occasioned by the prevalent and hitherto unprecedented low price of cotton was gloomy. At this juncture James Alcorn took sole charge of the estate under these adverse conditions, and, whatever ill may be related of him otherwise, he undoubtedly instituted such a system of economy and prudent management as to enable him to discharge practically the indebtedness of the estate, finally turning it back to his mother free of incumbrance.

During this time, and until his death, his mother trusted him implicitly, and apparently needed not Gov. Alcorn's admonition that she

"treat him with that favoritism and partiality which he well knew her heart inclined her to do."

It is conclusively shown that James Alcorn desired Eagle's Nest plantation, a most natural wish, and it may be that, in pursuance of his desire, he was led into conduct and undertakings which sometimes lacked delicacy and propriety; yet is it sufficiently in evidence that his actions, however open to the criticism of occasional indelicacy and impropriety, descended in any instance to the slimy depths of fraud? We do not so consider.

[5] But as regard fraud and the exercise of undue influence, the proposition is clearly stated that:

"The undue influence which will avoid a deed is an unlawful or fraudulent influence which controls the *will of the grantor*. The *affection, confidence, and gratitude* of a parent to a child which inspires a deed or gift is a *natural and lawful influence*, and will not render the deed or gift voidable unless such influence has been so used as to confuse the *judgment* and *control the will* of the donor." Sawyer v. White, 122 Fed. 223, 58 C. C. A. 587.

Applying the above rule to the consideration of the case at bar, is the proof sufficiently convincing that James Alcorn exercised such an unlawful and fraudulent influence as to confuse the judgment and control the will of his mother in securing this deed? Rather was it not the affection, confidence, and gratitude moving a fond mother's heart and inspiring the wish for her only son to enjoy after her death the property, which the proof shows he managed and served and extricated from the weight of heavy incumbrances? This son remained her only protector, filling in a measure his father's place. How well he did so is of record in this cause, and a reading abundantly discloses that she at no time during his life questioned his fidelity to her interests. Neither does it appear that there was a time during the years subsequent to Gov. Alcorn's death to the day of the death of James Alcorn that he was compelled, had he been disposed so to do, to resort to fraud to induce his mother to a compliance with his wishes.

She did "what her heart inclined her to do," and which was only a "natural lawful influence" bubbling from that unfailing fount, the purest, a mother's holy love, which has been beautifully characterized as "boundless as the sunlight, as deep as fathomless sea."

Meanwhile with Mrs. Alcorn old age creeps on apace, and, with it, its attendant train of infirmities. The dead husband fades into a memory, and the son, whose lips are cold in death, has none to plead his cause. Unhappy differences since his death have arisen, and relations with her son's widow and her grandson have been strained to the breaking point. The living are present and very dear, becoming dearer, and naturally so, as life's shadows lengthen. In this decline, the living become the dearest, and in their direction the pendelum of their mother's affections swung, culminating in the attempted disposition of that property which she, in another more unclouded day, bestowed upon her dead son.

In view of the foregoing, the court is of opinion that the complainants should be denied the relief sought in the bill.

Independent of the defenses of ratification, acquiescence, equitable estoppel, and laches interposed, we think the bill should be dismissed. These defenses, however, will be briefly considered. They have been presented with great clearness, and as ably controverted by counsel of the respective parties. Without going into a discussion of the technical significance of each of the terms and their application to the case at bar, under the proof herein the principle of ratification that "any acts of recognition of a contract as subsisting, or any conduct inconsistent with the intention of avoiding it, have the effect of an election to affirm" (Cyc. 37, with authorities), would seem to be controlling.

The entire record of the case No. 700 in the chancery court of Coahoma county, made a part of the record in this cause, establishes beyond controversy that *Mrs. Alcorn recognized the deed of October 14, 1895,* to her son James as did *her daughters and relatives,* besides *friends of the family and employés* of the estate, and that in bringing this suit her conduct is certainly inconsistent with an intention of avoiding it. On this ground alone, the relief sought should be denied. The further application of the principle of acquiescence and equitable estoppel would tend only to strengthen this conclusion; the doctrine and principle of laches, however, would have no application.

Let a decree in accordance with this opinion be entered, taxing the complainants with the costs of this cause.