GRIFFIN, executor, v. BARRETT et al.

No. 11375. SEPTEMBER 18, 1936. REHEARING DENIED OCTOBER 16, 1936.

*Charles J. Thurmond, Wheeler & Kenyon,* and *Sam Jolly,* for plaintiff.

*Davis & Stephens, J. B. G. Logan,* and *E. C. Stark,* for defendants.

GILBERT, Justice. W. A. Griffin died on January 7, 1935, leaving a will which was executed on October 28, 1933, and which was probated in common form by the executor named therein, his son, Thos. S. (Vannie) Griffin. By the will the testator bequeathed and devised all of his property to his wife, Jane Griffin, during her

life, and at her death to five of his children, including the executor. To two of his children, Mrs. Tishie Barrett and Mrs. Addie Massey, he bequeathed the sum of one dollar each, and as to another son, Ross Griffin, who was not bequeathed anything, he made known in the will that "I am executing a deed to certain real estate, being the place where the said Ross Griffin now resides." In the item with reference to the last-named three children it was stated: "My reason for making this disposition as to these named in this item, they have already gotten their portion and as much as I want them to have." After the probate of the will in common form, Mrs. Tishie Barrett and Mrs. Addie Massey cited the executor to probate the will in solemn form, and upon his application to do so they filed a caveat upon the grounds: "(a) It is not the will of W. A. Griffin, deceased, because he, at the time said writing was signed and executed, was insane and incapable of making a will. (b) The will offered for probate in solemn form is not the will of W. A. Griffin, deceased, but the will of Thomas Sylvanus (Vannie) Griffin and Jane Griffin, and had petitioners' father, W. A. Griffin, been left uninfluenced by Thomas Sylvanus (Vannie) Griffin and Jane Griffin, petitioners would have been remembered in the will of their father, W. A. Griffin, deceased. (c) Petitioners worked in the field continuously while they were at home, and assisted in accumulating the property of which their father died seized and possessed at the time of his death, and have never received anything from the estate as set out in item four of said will, and the testator had no ill will toward petitioners, nor would he have executed a will disinheriting them from the property they assisted and aided in accumulating, had not the mind of somebody else been substituted for his will. (d) The will offered is an unreasonable will, and shows on its face that it is the will of Thomas Sylvanus (Vannie) Griffin, the executor named therein, as it gives said executor the right to divide, sell, or keep the property of said executor as he may desire. (e) At the time of executing the said will W. A. Griffin, because of advanced years and prolonged illness, was peculiarly susceptible to be influenced by the wishes of Jane Griffin and Thomas Sylvanus (Vannie) Griffin, and the provisions of the will were not a free and voluntary expression of his own will as to the disposition of his property, but was an expression of the wishes and will of Jane Griffin and Thomas Sylvanus (Vannie) Griffin, who,

knowing of his physical disabilities and afflictions, so harassed and annoyed the testator with constant appeals and importunities as to induce him to discharge his own scheme for the disposition of his estate and substitute therefor the scheme of Jane Griffin and Thomas Sylvanus (Vannie) Griffin." In the court of ordinary judgment was rendered against the will, and on an appeal to the superior court a verdict and judgment were rendered against the will. The propounder filed a motion for a new trial on the general grounds, and by amendment added a number of special grounds, some of which were expressly disapproved by the court, and those which were approved are dealt with hereinafter. The court overruled the motion, and the propounder excepted.

It can not be seriously contended that the will was not executed in the formalities required by law, or that a prima facie case was not made by the propounder. As admitted by the defendants in error, Dr. B. B. Chandler and W. G. Martin, witnesses to the will, testified that the testator was apparently in full possession of his mental faculties at the time the will was executed. Such witnesses are not obliged to give the reasons for their opinions. *Scott* v. *McKee,* 105 *Ga.* 256 (2) (31 S. E. 183); *Dyar* v. *Dyar,* 161 *Ga.* 615, 619 (131 S. E. 535). It is urged, however, that the scrivener, Judge Whelchel, who was also a witness to the will, entertained a doubt as to the testator's mental capacity; but from a candid examination of his testimony in that respect the only fair and reasonable construction which could be placed upon it is that as a careful lawyer, observing the physical impairment of his client, he wanted to assure himself, and to have the other witnesses assure themselves, that his client was not incapacitated mentally. To that end he engaged in conversation with him, and in conducting the other witnesses to his office requested them to talk to him. A man is not to be deprived of legal assistance in putting his testamentary wishes in legal form merely because his mentality may be considerably impaired though not destroyed; and the conduct of the scrivener in this instance exhibits that honesty, fidelity, and prudence that should always be .exercised under similar circumstances. Judge Whelchel testified: "I talked to him at length. I hadn't known Mr. Griffin prior to this time, and my reason for taking as much time as I did I wanted to be certain about it as much as possible. He stated to me what he wanted placed in his will; and

after I made up my mind that he was capable of executing this instrument I dictated to my stenographer, who took it on the machine, I believe. I read it over to him, and after some conversation asked him if he understood the terms, and if they contained his wishes as to the disposal of his property. He said they did. I called two other witnesses to execute the will with me as subscribing witnesses to the will, and these persons were W. G. Martin and Dr. B. B. Chandler. Coming to my office I told them to talk to Mr. Griffin in order to remember the occasion, and for them to make up their minds as to his testamentary capacity and the signing of the will. The will was prepared, he signed it, and then we signed it as subscribing witnesses in his presence and in the presence of each other. . . At the time this will was prepared I don't recall anybody else telling me anything to put in the will or saying or doing anything in my presence to influence what was put in it or what was provided in the will. I don't know anything of that nature coming to light, because, as I stated at the outset, the only thing I remember about it he told me just what he wanted in it, and I talked to him and asked him several questions and deliberated with him on it, and no one used any persuasion in my presence. If they had I would have known it, and certainly I would not have prepared the will if they had. I would not have prepared the will for him and had it attested by these witnesses if in my opinion he had not essential capacity to make a will. I talked to the old gentleman at length. I saw he was weak in body. (On cross-examination.) Q. Then when you began talking with him there was some doubt in your mind as to his mental capacity to make a will? A. I saw he was weak in body. Q. Would you say weak of mind? A. That is the reason I talked to him—he impressed me to be weak of body, and I wanted to convince myself in the event anything came up. I got the subscribing witnesses. I would not say there was a doubt in my mind. I wanted some one else to corroborate me. I am still telling you he was weak in body, and I wanted to be sure. The fact he was in the condition he was aroused enough doubt that I wanted some one else to form an opinion. I asked the other witnesses to talk with him and question him and see what they thought." Taking all of the testimony together, the only reasonable interpretation to be put upon it is that notwithstanding a natural inquiry that might

have arisen as to the testator's mental condition, because of his obviously weakened physical condition, the scrivener and witness Whelchel concluded that he had sufficient mental capacity, and that he drew the will, asked the testator about it after it was prepared, and the witness stated: "I would not have prepared the will for him and had it attested by these witnesses if in my opinion he had not essential capacity to make a will." That is positive opinion, in effect, that he considered him competent. A prima facie case was made in favor of the will.

Dr. G. O. Castelow testified that he had treated the testator during the spring and summer of 1933, that his heart was leaking, paralysis coming on, his condition gradually growing worse, and being such that in the opinion of the witness he would not have been capable of transacting business at the time; that if asked anything, as a general rule it would take him a good while to make up his mind and answer, that his mind was dull, but that "at certain times just under certain kinds of conditions, taking all the time he needed and some one explaining it, he might understand that thing thoroughly. But if it was a new proposition, just hop in and tell him about it, without giving him time to sit down and reason it out, I don't think his mind would have been capable of giving a correct answer." If he went to a lawyer on the 28th of October, 1933, gave the names of his children, the name of his wife, told him what property he had and what he wanted to do with it, without any assistance, the witness would say by that he was a man that understood what he was doing; that in his opinion his mind was not clear, but get him down to a fine point and give him time to think, his mind did pretty well as far as being pretty clear, by which term he meant that his mind did not respond quickly when asked a question, but given time to concentrate he could form a rational reply; that he gave correct answers.

Dr. M. B. Allen testified that he attended the testator about four times at intervals of about two weeks, the last time being three days after the will was executed; that he complained of weakness, sickness at his stomach, vomiting after meals, had lost fifty pounds in weight, appetite was not good, living on soft diet, and not able to rest well at night. Dr. Allen found the valves of his heart leaking, his lower extremities swollen, liver enlarged so much that it could be felt, lungs congested, more or less water-logged, memory

poor and mentality judged as bad, his urine being two-plus albumen, containing granular casts and red blood cells. On October 14, 1933, he would not have considered the testator capable of transacting business, and on October 31st his condition was worse than on October 14th, his condition not such that he had lucid intervals; his mind did not come and go, as this was a mental slowness because of his physical condition. His records showed that he gave his correct age, marital status, manner and cause of his parents' death. Dr. Allen further testified: "I would say that if he knew the names of his children, five or six, recalling them correctly, the name of his wife, gives directions to a lawyer, the lawyer puts it in his will, he then signs it, he then counts out the fee and gave him the correct amount of money, I would say he had mind enough and sufficient intelligence to make a will. . . When I answered the question asked about the man that did that and I answered 'yes,' I answered that on the assumption that the man mentioned in the questions is a normal man. In my opinion from my examination of W. A. Griffin he could not have done that on October 28, 1933."

Lon Massey testified that he visited the testator on the day following the execution of the will, and talked with him; that in his opinion the testator was in pretty bad shape; that he talked with Vannie Griffin about a team and wagon to move down on their place, but he thought W. A. Griffin knew that was what he came for; that he said he was coming down to see the witness when he got moved; that he said he thought that would be a good place to make cotton; that in about five or ten minutes he got to where he did not know what he was talking about, started to get up, and said, "We better be going home." William Griffin said, "Pa, where'e you going?" and he said he wanted to go home. Witness thought his mind was all right when he went in at first. W. A. Griffin called him by his name. Witness thought he was in bad shape physically from the way he acted, seemed like he could not use his tongue like he had been, was in worse shape than he was the next spring. After he had been taken in the house, his son William returned and said that his father had been for a week where he would take spells and did not think he was at home. Witness did not talk to him any more until the next spring, and then his mind was all right and he seemed to be in fine shape and

as good as ever, knew his family and who his children were, knew everything next spring.

Details of other evidence upon which the defendants in error rely as showing lack of mental capacity and of undue influence are as follows: Vannie Griffin arranged beforehand with Judge Whelchel for the drawing of the will. He and his mother accompanied the testator to the office of Judge Whelchel. She testified: "He asked me to go with him. He asked me was I able to go with him that day, and I told him I would go anyway. . . He talked to me about his will several times before he made it. I answered when he talked to me about it. I told him I didn't want him to make it to me; just to make it to my lifetime; I'd rather he would make it some other way, and he said he was going to make it that way." When the party arrived at Judge Whelchel's office Vannie Griffin said, "Here is my father. He wants you to prepare him a will." The testator did not sign his name to the will, but made his mark. The evidence showed that a year or two before he died a hog attacked him and cut the muscles of his right arm, after which occurrence some days he could not write and some days he could. Therefore it is argued that the will was executed on an "off day;" that he went to his death without knowing of the death of his sister, Mrs. Morris, a year and a half previously, and of the death of his brother, Doroty, more than a year previously. As to the evidence of members of his family that they did not wish to worry him because of his illness, it is contended that had he been strong mentally he would not have been unduly disturbed over the death of two members of his family; that the beneficiaries under the will would not permit Jones Griffin, the brother of the testator, to talk with him unless some of them were present, and finally forbade his entering the sick-room under a statement that it was in accordance with the orders of the doctor, it being argued that such acts indicated a part of a scheme to secure the estate for themselves; that during 1931 and 1932, according to the testimony of Mrs. Tishie Barrett, caveatrix, Vannie Griffin managed his father's business because of the father's condition; that W. A. Griffin could not make change, would sometimes wander off, would start to town with the boys, and they would pull him out of the car because he did not have mind enough to take care of himself; that he would overeat, was stopped from operating his grist-mill because his

family feared he would fall in the mill-race and be drowned; that on one occasion he set down a slop-bucket and came into the house looking for it; that according to the testimony of Mrs. Addie Massey, caveatrix, during 1931 and 1932, and up to the last time she saw him in 1933, his mind was bad, his power of recollection gone; that he would forget what he was doing; that he laid off a grave at the cemetery where the witness could bury her child, and after the burial came to the house from a visit to the cemetery, complaining that somebody had been buried in his lot; that during this time Vannie Griffin sold the cotton, bought the fertilizer, rented the places, furnished stock and rations to the renters, and managed the business; that in December, 1933, Mrs. Massey attempted to visit her father, but in the yard was denied access to him; and that as to another sister waiting at Homer to learn from Mrs. Massey if she might visit her father at his home, it was said to Mrs. Massey by Vannie that there would be trouble if she came. Other evidence to be taken in connection with the above is that Mrs. Tishie Barrett, caveatrix, testified that she moved from her father's place in August, 1932, was not around there in 1933; that the reason she moved was that "they took what we made, they hauled our cotton over there and throwed it off, and wouldn't settle up with us, and my mother come down here and tried to get out papers to throw us out;" and that in 1933 she did not know a thing about the condition of her father's mind.

Mrs. Addie Massey testified that she had been away from home thirteen years, visited at home in 1931 and 1932, but was not there in 1933, that the family would not let her see him in 1933, stating that his mind was bad; that her father had promised that there would be a home apiece for the children; that she knew her father did not have mind enough to write a will and would not make one while his mind was good; that during the spring of 1933 Vannie came to her home and wanted her to move "up there," brought his wagons to move her, and that she told him her father did not rent her any place, and Vannie said her father's mind was bad and he was not able to see after the place, and just to come on and move up there. She further testified that Vannie and her mother controlled her father, and he yielded to whatever they asked or demanded after his mind got bad, but previously he did as he pleased; that when her father went to Gainesville she had not seen him in

about a year, but in the early part of 1933 she did not think his mind was good enough to make a will.

Dr. M. A. Allen testified, in answer to a hypothetical question incorporating the facts of the testator's visit to Judge Whelchel at the time of the making of the will, that in his opinion he could not do those things; but, as shown by other witnesses, he did in fact do them. While giving such opinion, he stated, however, that "he wasn't any time totally bereft of reason." C. C. Ward testified that he was the undertaker in charge of the funeral of W. A. Griffin; that neither Vannie Griffin nor Mrs. Griffin, the wife of the testator, gave him any order not to let Mrs. Barrett or Mrs. Massey view the body; that Dewey Griffin, a cousin of Vannie, told him not to open the casket any more, and William Griffin also did; that at the cemetery it was opened at Vannie's request, but that he did not say for whom.

D. R. Phillips testified that he talked with W. A. Griffin in 1933 and until his death, seeing him often; that W. A. Griffin looked after his cattle, that the witness discussed various subjects with him; that on one occasion the witness went to the home of W. A. Griffin with reference to measuring a mail route; that Griffin said he had a wire clothes-line which could be used for a chain, and he carried one end of it, the witness keeping tab, and one of the boys carried the other end; that at that time the tax-receiver came along, and W. A. Griffin gave in his taxes and some property that belonged to his wife, telling William to sign for him, as William could write faster; that in the fall of 1933 W. A. Griffin would seem to have good days and bad days, but his answers seemed to be all right; that he saw him on Sunday before court started in October, 1933, and noticed that W. A. Griffin had been drawn on the jury, and Griffin said that he always responded but did not believe he would be able to attend that court. In witness's opinion his mind was all right on that day.

Mrs. W. A. Griffin, the wife of the testator, testified that her husband asked her to go with him to Judge Whelchel's office; that neither she nor Vannie suggested to him what to put in the will; that he had talked to her previously, and she told him she did not want him to make it to her, but just to make it for her lifetime, and he said he was going to make it that way; that she had not been feeling well, and he asked her if she was able to go with him

on the day the will was made, and she said she would go anyway; that Vannie and William went, too; that nobody influenced him in making the will; that after it was prepared and read over to him he said it was the way he wanted it; that, as she thought, Vannie was out of the room when W. A. Griffin told Judge Whelchel what to put in the will; that her husband's mind was good that day, so far as she knew; that she did not recollect about the part of the will as to a deed to her son Ross, but heard the will read, and on that occasion he did not have the old deeds with him; that he told Judge Whelchel that. She testified as to several amounts of money her husband let Mrs. Barrett have, that Mrs. Barrett's husband made a crop and got money for the next crop, did not pay all of the bill; that they never got all the cotton sold, there was one bale left in the house, and when he got mad she asked him to haul the cotton away, and W. A. Griffin asked him to do so, and he cursed her and said he was not going to do it; that they were living on her land, and her husband was furnishing them, and she did not have anything to do with it; that her husband did not attend the funeral of his sister, Mrs. Morris, as they did not want to worry him and did not tell him about her death; and that the same was true as to his brother, Doroty Griffin, who died at Alto.

Thos. S. (Vannie) Griffin testified that at the request of his father he inquired of Judge Whelchel about making a will, accompanied his father on the day the will was made, introduced his father, told Judge Whelchel what he wanted, said he would go and do a little shopping, and left, and when he returned in about thirty minutes the will had been drawn; that he never talked with his father about making a will, never suggested that he make a will or that anything be put in it; that his father's mind was all right that day; that his father knew everything as well as he ever did; that he never bought any clothes for his father until 1934; that his father could tell the size of a bill, did his own renting until he got sick in 1933, and in 1934 the witness rented the land; that after his father got his arm cut by the hog he frequently asked some one else to sign his name for him; that he never told witness what he wanted to put in the will, but did say what he wanted to leave out, and said he wanted the two girls to have what they had got as their interest in the property; that witness could not tell if his father got mad with Mrs. Massey because he had a little trouble

with Mrs. Barrett; that he got mad with Mrs. Massey because she said some hard words about him along about the first of 1933; that witness did not hear any words between his father and Mrs. Barrett; that when he went to Mrs. Massey to move her, it was to his own place, and not to his father's that he meant to move her; that she said Mrs. Barrett had told her her father had made a will and disinherited her, and that was the reason for her not going; that his father wanted to know why she did not come, and he told him what she said about moving, and he said that if she was going to listen to Barrett and believe what he said, she could just share like they did; and that the state of his feelings toward the sisters is not as good as it ought to be, the way they treated him and his father.

A. J. Griffin testified that when his brother, W. A. Griffin, lost a brother and sister, he was in bad health, that the witness did not think he was able to stir around; that he was a man of unusually good judgment when at himself, not easily influenced, and witness does not think he could have been, but does not know what could have been done after he got sick; does not know anything about anything being wrong with his mind in 1933; that he went to see his brother several times during his sickness, but one of the girls told him the doctor did not want him to go in, saying that it affected him more than anybody that went in; that he asked his brother to come to the witness's home, and he talked like he wanted to come, but witness was not permitted to talk to him without one or two in the room in 1933—it might have been 1934; that the way he talked his mind was all right; and that he knew the witness, the witness's wife, and talked about her.

A careful consideration of the evidence convinces us that, aside from suspicion as to lack of testamentary capacity and undue influence, there is in fact no direct or circumstantial evidence to support the verdict. "It would be unnatural if one's claim to testamentary benefaction should not weigh heavily in the mind of the claimant, and that an adverse disposition should not seem unreasonable and unjust. Indeed, the latter is calculated in many instances to produce the perfectly honest opinion that. the disposi-. tion made is convincing evidence that the testator was mentally unbalanced and without testamentary capacity, or that undue influence substituted the will of another for that of the testator.

Slight facts assume exaggerated importance, casting suspicion upon very worthy and natural acts and motives." *Cook* v. *Washington*, 166 *Ga.* 329, 343 (143 S. E. 409). It would be overturning a very ancient and treasured right if one could be heard to complain that a testator may not, having testamentary capacity, freely and in his own estimation of the claims of those about him, execute a will devising and bequeathing his property, if not contrary to law. Recognizing the precious prerogative of a testator to make provision for the disposition of his property after death, it is the duty of courts to see that where a will has been shown to have been probated in a prima facie way, the burden of overcoming the presumption of its validity must be unmistakably carried by him who disputes it. Clearly the testator in the present case was a man who had been physically ill for several years preceding his death. The evidence discloses that his decline, physically and mentally, began about four years before his demise, and that members of his family, naturally solicitous of his welfare, found it necessary to restrain him from business activity, and to perform for him details of farm and tenant management which he had formerly exercised as a man of unusual force and mind. But there is nowhere any evidence that even when admittedly compos mentis, he complained of or resisted such conduct of those close to him, but rather that he acquiesced in it. It is not inconsistent with testamentary capacity that a man may yield to such importunities in matters that do not really harm him or his interests, and yet may privately reserve to his own secret processes of thought his plans and prerogatives as to the making of his will when the time shall be deemed opportune. As the ravages of disease, valvular heart trouble and kidney complications, gradually broke down his constitution, his mind also became impaired, but there is nowhere any testimony that at any time was he totally bereft of reason.

"Eccentricity of habit or thought does not deprive a person of the power of making a will; old age and weakness of intellect resulting therefrom does not, of itself, constitute incapacity. If that weakness amounts to imbecility, the testamentary capacity is gone. In cases of doubt as to the extent of this weakness, the reasonable or unreasonable disposition of his estate should have much weight in the decision of the question." Code, § 113-205. "A person has testamentary capacity who understands the nature of a testament

or will, viz., that it is a disposition of property to take effect after death, and who is capable of remembering generally the property subject to disposition and the persons related to him by the ties of blood and affection, and also of conceiving and expressing by words, written or spoken, or by signs, or by both, any intelligible scheme of disposition. If the testator has sufficient intellect to enable him to have a decided and rational desire as to the disposition of his property, this will suffice." *Slaughter* v. *Heath,* 127 *Ga.* 747 (57 S. E. 69, 27 L. R. A. (N. S.) 1) ; *Wynne* v. *Harrell,* 133 *Ga.* 616 (66 S. E. 921) ; *McFarland* v. *Morrison,* 144 *Ga.* 63 (2) (86 S. E. 227) ; *Davis* v. *Frederick,* 155 *Ga.* 809 (2) (118 S. E. 206) ; *May* v. *May,* 175 *Ga.* 693 (2) (165 S. E. 617). As to the quantum of mentality, the weak have the same rights as the prudent and strong-minded to dispose of their property by will, and anything less than a total absence of mind does not destroy that capacity. *Potts* v. *House,* 6 *Ga.* 324, 328 (50 Am. D. 329) ; *Terry* v. *Buffington,* 11 *Ga.* 337, 345 (56 Am. D. 423) ; *Hall* v. *Hall,* 18 *Ga.* 40 (4) ; *Morris* v. *Stokes,* 21 *Ga.* 552 (5), 571; *Maddox* v. *Simmons,* 31 *Ga.* 512, 527; *Gardner* v. *Lamback,* 47 *Ga.* 133, 193; *Mason* v. *Taylor,* 162 *Ga.* 149 (132 S. E. 893). An incapacity to contract is not inconsistent with the capacity to make a will. Code, § 113-202; *Wood* v. *Lane,* 102 *Ga.* 199, 201 (29 S. E. 180). The condition of the testator's mind *at the time of the execution of the will* determines whether or not he can make a valid will. *Terry* v. *Buffington,* supra; *Walters* v. *Walters,* 151 *Ga.* 527, 530 (107 S. E. 492) ; *Brown* v. *Kendrick,* 163 *Ga.* 149, 168-9 (135 S. E. 721), and cit.; *Cook* v. *Washington,* supra. Undue influence in procuring a will to be made must amount to moral coercion; it must destroy the free agency of the testator and constrain him to do what is against his will but which he is unable to refuse. Not all influence is undue. *DeNieff* v. *Howell,* 138 *Ga.* 248 (6) (75 S. E. 202) ; *Burroughs* v. *Reed,* 150 *Ga.* 724 (105 S. E. 290) ; *Rickelson* v. *Rickelson,* 151 *Ga.* 540 (107 S. E. 522) ; *Ward* v. *Morris,* 153 *Ga.* 421 (3) ; *Cook* v. *Washington,* supra; *Peavey* v. *Crawford,* 182 *Ga.* 782 (187 S. E. 13). A general averment that certain legatees influenced the testator to make a will presents no issue of undue influence. *Peavey* v. *Crawford,* supra.

Applying the above principles of law to the facts of the case, we find nothing inconsistent with the validity of the will executed on

October 28, 1933. No expert testified that W. A. Griffin was at any time totally bereft of reason. Dr. Allen, in answer to a hypothetical question as to certain acts in connection with the execution of the will, gave as his opinion that the testator was not competent to perform them; but, as testified to by other witnesses, he did perform them, and there was no evidence to the contrary. Furthermore, on the precise question as to strength of mind, he testified that the testator "was not at any time totally bereft of reason." The testimony of non-expert witnesses did not show him lacking in testamentary capacity at the time of the execution of the will. While the caveatrices testified that when they saw him they did not regard him as of sufficient mental capacity to make a will, they were shown not to have been in close contact with their father, and they had not seen him for more than a year before the execution of the will. Mrs. Barrett affirmatively testified that she did not know the condition of his mind on October 28, 1933, the date the will was executed. Nor is there any evidence of undue influence as contemplated by the law. Mrs. Griffin, the wife, and Vannie, the son, testified positively that they never sought in any way to influence him, and never suggested the making of a will or how he should prepare it. Mrs. Griffin swore that her husband several times mentioned the subject to her, and that the only thing she said to him as to his proposal to give her a fee in the property was that she would prefer a life-estate, and that he answered that he was going to make it that way. She had a right to suggest that preference, and his final devise of a life-estate to her, an interest less than the fee, certainly can not be construed to show any dominion over him by the wife. The act of Vannie Griffin and the wife accompanying the testator to the office of Judge Whelchel is entirely consistent with that natural desire to aid a sick member of the family in such an enterprise; and no suggestion or influence whatever is shown to have been exerted upon him after he arrived at the office. Various details were mentioned by the caveatrices as the basis for their opinion that their father was unduly influenced by Vannie Griffin and Mrs. Griffin; but a careful examination shows that they were not inconsistent with the direct positive testimony of Mrs. Griffin and the son that they never in any way unduly influenced him. In such a case the direct testimony as to the facts must prevail. *Frazier* v. *Georgia Railroad & Banking Co.*,

108 *Ga.* 807 (33 S. E. 996); *Taggart* v. *Savannah Gas Co.,* 179 *Ga.* 181 (175 S. E. 491). In case of conflict the jury is ordinarily the judge of the evidence, but the mere fact that there are conflicts in the testimony does not render the direction of a verdict in favor of a party erroneous when it appears that the conflicts are immaterial, and that, giving to the opposite party the benefit of the most favorable view of the evidence as a whole and of all legitimate inferences therefrom, the verdict against him is demanded. *Sanders Mfg. Co.* v. *Dollar Savings Bank,* 110 *Ga.* 559 (2) (35 S. E. 777); *Skinner* v. *Braswell,* 126 *Ga.* 761 (2) (55 S. E. 914); *Walters* v. *Walters,* supra; *Cook* v. *Washington,* supra. "Where there is no conflict in the evidence, and that introduced, with all reasonable deductions or inferences therefrom, shall demand a particular verdict, the court may direct the jury to find for the party entitled thereto." Code, § 110-104. Giving to the caveatrices the benefit of the most favorable view of the evidence as a whole and of all legitimate inferences therefrom, the evidence demanded a finding in favor of the will. It is argued that the testator discriminated against the two caveatrices, and that the will was an unnatural one; but it is not shown that the testator was prejudiced against them by either Vannie Griffin or Mrs. Griffin or any other member of the family. "A testator may have his preferences, dislikes, and animosities toward his heirs, and may be guided by them in the disposition of his estate; still, if he is competent in mind, and makes a will freely and voluntarily, these conditions of mind will not per se destroy his testamentary capacity. And although prejudices may be unfounded, still if they are not used to coerce and control his will or impose a fraud upon him, they will not avoid his will." *Carter* v. *Dixon,* 69 *Ga.* 82 (6). Furthermore, the reasonableness or unreasonableness of a will, while a legitimate subject of investigation by a jury *in case of doubt* as to the testator's capacity to make a will, is not to be considered until such a doubt has been first created by other evidence. *Penn* v. *Thurman,* 144 *Ga.* 67 (3) (86 S. E. 233); *Thompson* v. *Ammons,* 160 *Ga.* 886, 892 (129 S. E. 539), approving a charge to this effect. Inasmuch as the evidence demanded a finding in favor of the will, it follows that the court erred in overruling the motion for a new trial on the general grounds.

*Judgment reversed. All the Justices concur.*

RUSSELL, Chief Justice, concurs specially.