## COOK *et al. v.* WASHINGTON.

1. The court did not err in directing a verdict for the propounder.
2. "In all cases, a knowledge of the contents of the paper by the testator is necessary to its validity; but usually, where a testator can read and write, his signature, or the acknowledgment of his signature, is sufficient. If, however, the scrivener or his immediate relations are large beneficiaries under the will, greater proof will be necessary to show a knowledge of the contents by the testator." Civil Code (1910), § 3850. Under the evidence, a finding that the testatrix had knowledge of the contents of the will was demanded.
3. Movants complain that the court erred in refusing to rule out the testimony of E. B. Dunlap, that he knew that the testatrix "intended item 17 of the alleged will to mean Sarah Elizabeth Cook, deceased, a former sister of Mrs. Hunt, and that said item 17 should be and was intended to be 'my beloved sister Sarah Elizabeth Cook and her children

and grandchildren' instead of 'my beloved niece Sarah Elizabeth Cook and her children and grandchildren.'" This contention is without merit. The present inquiry is whether the will is valid as against the caveat on the grounds of mental incapacity or undue influence. If material on this question, the evidence was not cause for a new trial. The question of whether, as to the particular legacy in item 17, the testatrix died intestate is not involved.

4. The remaining grounds of the motion, 8 and 9, do not show error and do not require special statement.

No. 6397. MAY 16, 1928.

Appeal from probate of will. Before Judge Sutton. Hall superior court. November 19, 1927.

This case is made by a caveat to the propounding of the will of Mrs. Aurora Strong Hunt, who died a resident of Hall County, Georgia, on April 12, 1927. She left the following will:

"Georgia, Hall County. I, Aurora Strong Hunt, of said State and county, being of sound and disposing mind and memory, do make this my last will and testament, hereby revoking all others that I have heretofore made.

"Item 1. It is my will that my body be buried in a decent and christian-like manner, by the side of my late beloved husband, James H. Hunt, in the Alta Vista Cemetery of Gainesville, Georgia, upon the lot that I have heretofore provided.

"Item 2. It is my will and desire that all my just debts be paid as soon as practicable after my death.

"Item 3. I will, bequeath, and devise to J. H. Pitchford that house and lot located and situate on the corner of Gower and Simmons Streets within the corporate limits of Gainesville, with all rights, members, and appurtenances to the said lot and of land belonging.

"Item 4. I will, bequeath, and devise to Roma Savage a certain tract or parcel of land containing one hundred (100) acres, more or less, in Hall County, Georgia, and being a part of the Glades property and being the same one hundred acres selected by Roma Savage for purchase from me, with all rights, members, and appurtenances to the said lot of land belonging.

"Item 5. I will, devise, and bequeath to the Trustees of the University of Georgia all the remaining lands of the Glades property owned by me, with the exception of the one hundred acres given Roma Savage in item four of this will, containing approximately fifty-five hundred (5500) acres, and located in Hall County,

Georgia, near Brookton Station, to be used by them as a memorial to my beloved husband, James H. Hunt. It is my wish that an Industrial School be located thereon for the education of the mountain boys of North Georgia, if the Trustees of the University of Georgia see fit and proper; but if not, then I desire that the proceeds from the sale of the lands be used as a loan fund for worthy North Georgia boys, and known as the 'James H. Hunt Loan Fund,' and to be administered by the trustees aforesaid.

"Item 6. I have heretofore by deed given to the Trustees of Brenau College-Conservatory at Gainesville, Georgia, sixty (60) per cent. of the properties located at 10th Street on Peachtree Street in Atlanta, Georgia, and described in deed to them. Now, I will, devise, and bequeath to the Trustees of Brenau College-Conservatory the remaining interest of forty (40) per cent. of the said properties, to be used by them as a fund for the education of North Georgia girls, the fund to be known as the 'Aurora Strong Hunt Loan Fund,' and to be administered by them, the Trustees of Brenau College Conservatory.

"Item 7. I give, devise, and bequeath to Henry Washington, who has been my faithful advisor, and in consideration of his advice and services, the sum of fifteen thousand dollars.

"Item 8. I give, devise, and bequeath to Edgar B. Dunlap, my counsel, and in consideration of his services, the sum of five thousand dollars.

"Item 9. I direct that my executor hereinafter named give in my name and for me all my personal articles, such as jewelry, clothes, and furniture to those friends of mine as I have heretofore directed him.

"Item 10. I will and bequeath to the Baptist Orphans' Home located at Hapeville, Georgia, the sum of one thousand dollars.

"Item 11. I will and bequeath to the Deacons of the First Baptist Church, Gainesville, Georgia, the sum of one thousand dollars.

"Item 13. I will and bequeath to the sons of my counsel, namely James Anderson Dunlap and Edgar B. Dunlap Jr., the sum of five thousand dollars each, for the primary purpose of their education. In the event of their death before they have had the opportunity to use the said sums, I will and direct that the said sums go to their heirs. I name Edgar B. Dunlap, their father, as the trustee of this money, and direct that he invest it for them and their use.

"Item 14. I will and bequeath to my niece, Aurora McGhee, and to each of her two children the sum of twenty-five hundred dollars each.

"Item 15. I will and bequeath to my niece, Mary Simpson, and to each of her four children the sum of twenty-five hundred dollars.

"Item 16. I will and bequeath to my nephew, I. Isham Strong, the sum of twenty-five hundred dollars.

"Item 17. I will and bequeath to my niece, Sarah Elizabeth Cook, and to each of her children and to each of her grandchildren the sum of twenty-five hundred dollars each.

"Item 18. I desire and direct that my executor hereinafter named set aside and provide sufficient sums for scholarships for the following named children at the designated institutions of learning. It is my wish that these children have the benefit of a college education, and I do so here direct my executor.

Melba Hale, Scholarship at Brenau College Conservatory

Jas. Hunt Bowen, Scholarship at University of Georgia

Jimmie Savage, Scholarship at Brenau College Conservatory

Oglesby Savage, Scholarship at University of Georgia

Jas. H. Hunt, Scholarship at University of Georgia

Aurora Hunt, Scholarship at Brenau College Conservatory

The last two named being children of Tom Hunt, a nephew of my beloved husband, James H. Hunt.

"Item 19. I will and bequeath to Ella Sosby, my former maid, the sum of one hundred dollars.

"Item 20. I will and bequeath to Sidney O. Smith the sum of one thousand dollars.

"Item 21. I will and devise and bequeath the sum of five hundred dollars to Miss Ethel Bowers, and my doctor, Dr. J. B. Rudolph.

"Item 22. All the balance and residue of my estate, both real and personal, of every sort soever, not hereinbefore specially bequeathed and devised, to be sold by my executor and divided into five parts and to be distributed by my executor as follows:

"(a) A life's interest in two fifths (2/5) of the residue of my estate to Miss Hulda Hunt, my sister-in-law. It is my direction that the income on this part of my estate be given to Miss Hulda Hunt for her livelihood and during her life, and upon her death I desire and direct that the principal amount go to the Trustees of

Brenau College for the expressed purpose of providing a suitable building for the Domestic Science Department and to be known as the 'Aurora Strong Hunt Hall.' It is my will that my executor invest this 2/5ths part of the residue of my estate in non-speculative bonds, the income of which to go to Miss Hulda Hunt as aforesaid, and at her death the bonds to be delivered to the Trustees of Brenau College Conservatory as aforesaid.

"(b) One part of the residue of my estate to go to my sister, Tabitha J. Shannon, and the heirs of her body.

"(c) The balance or two fifths of the residue of my estate I will and bequeath and devise to the Trustees of the University of Georgia, to be used by them as a loan fund for worthy North Georgia boys and known as the 'James H. Hunt Loan Fund,' and to be administered by the Trustees of the University aforesaid.

"Item 23. I will and direct that in the event any one of the heirs under this my last will and testament contest this will or attempt to defeat my purposes as herein expressed, then and in that event the devise or legacy contained herein to that person so contesting this will is rescinded and revoked, and his or her share is to revert to my estate, and my executor is directed to deliver to that contesting person the sum of one dollar in full payment of any claim whatsoever against my estate.

"Item 24. I hereby constitute and appoint my friend, J. Henry Washington, the sole executor of this my last will and testament; and I expressly confer upon him, as such, to administer my estate, excusing him from giving any bond, or making any returns to the ordinary; and I expressly confer upon him the full authority and power to sell any part of my estate, not hereinbefore specially devised, at public or private sale, with or without notice, as he may deem best, and without order of the court, making good and sufficient conveyances to the purchaser and holding proceeds of the said sale to the same uses and trusts as hereinbefore declared in the several items of this my will. I further hereby expressly confer upon him the authority and power to borrow money for the use of the said estate, in any instance where he may think it necessary and proper, and to secure the same by lien, mortgage, security deed, or trust deed or other form of security to or upon any part of my estate, not hereinbefore specially devised; this he may do without the order of any court.

"I desire and direct that my counsel, Edgar B. Dunlap, be the attorney for the executor of my estate. It is my will and desire that the fees allowed the attorney for the executor, namely Edgar B. Dunlap, be equal to and the same as the commissions allowed the executor of my estate, J. Henry Washington.

"This the 11th day of April, 1927.

　　　　　　　　"Aurora S. Hunt (Seal) Mrs. J. H. Hunt.

"Signed, sealed, declared, and published by Aurora Strong Hunt, as her last will and testament, in the presence of us, the undersigned, who subscribe our names hereto in the presence of said testatrix, after she had signed her name thereto, and at her special instance and request, and in the presence of each other. This the 11th day of April, 1927.

　　　　　　"S. B. Carter.　T. E. Atkins.　Jas. A. Rudolph."

The grounds of caveat were undue influence and mental incapacity. As originally filed the caveat admitted due execution of the will, but this admission was later withdrawn by amendment. Caveators allege that testatrix "did not understand the contents, nor the purport and the effect of the language used in the paper she was signing, because of her physical and mental condition, the weakness of her body and mind; her lack of testamentary capacity, the undue excitement attending the execution of said pretended will and just preceding the same, the medicine she had taken just preceding the signing; the failure to read the will over to her in the presence of the witnesses, the failure to allow her reasonable time to understand the contents and the effect of the paper prepared by said Dunlap in his office and out of the presence of the said Mrs. Hunt;" that in February, 1927, testatrix was in a weak and critical condition, suffering from severe heart attacks, and about the middle of that month she took a trip in a motor-car to Florida, and became much worse, returning to Gainesville by rail and after considerable suffering she was taken to the Downey Hospital in Gainesville, where she underwent an operation; that while in said hospital she was continually given morphine and other narcotics "to allay her great suffering and prevent her speedy death;" that the effect of the operation was to leave Mrs. Hunt in a very "serious, weakened, and critical condition;" and it was apparent that she would live only a short time; that her heart attacks became more frequent, confining her to her room

nearly all the time, any undue excitement likely to result fatally any time; that on April 11th, the day before her death (and the day the will was signed), she had a conference with Edgar Dunlap, her attorney, with regard to the making of the will; that the will was prepared by Dunlap in his office and afterwards on the afternoon of April 11th submitted to Mrs. Hunt by him at her residence; that Dunlap found one Oglesby in Mrs. Hunt's room, conversing with her, and requested him to leave; that Oglesby declined, and there followed a heated argument, violent oaths and threats by Oglesby, who drew a knife; that Dunlap departed leaving Oglesby angry and causing great excitement and alarm to Mrs. Hunt; that in a few moments Dunlap returned and with the assistance of others removed Oglesby, leaving Mrs. Hunt in a very serious, excited, and critical condition bordering on collapse, so that a physician was called in; that Mrs. Hunt kept digitalis in her room, furnished by her physician for sudden heart attack, of which she took a dose before his arrival; that the violent quarrel in her presence, followed by taking said drug, destroyed her testamentary capacity, she being an old woman of 68 years, with chronic heart trouble aggravated by a painful operation, with death fast approaching, and rendered her utterly incompetent to execute a will and unduly influenced her, and left her in a state unable to understand the contents of said pretended will, and unfit to execute the same. It is further alleged by caveators that Mrs. Hunt executed the will under a mistake of fact as to the existence and relationship of Sarah Elizabeth Cook; that she did not know, at the time of executing said will, that Sarah Elizabeth Cook, her sister, had died some nine or ten years before, but thought said sister was her niece and living, and that she had children and grandchildren; that she was unable to remember that the only niece she had named Elizabeth was Eula Elizabeth Short, who had been married for many years, and who was the daughter of Sarah Elizabeth Cook, and that Eula Elizabeth Short had no children or grandchildren. The caveat further alleges that the will is unreasonable and unnatural in its provisions.

Evidence was introduced for propounder and caveators. The court directed a verdict in favor of the propounder. A motion for new trial was overruled, and the caveators excepted. Several grounds of the motion assign error upon the direction of the

verdict, it being insisted there was a conflict in the evidence on the question of mental capacity and undue influence, and that the issue should have been submitted to the jury. The three witnesses to the will were introduced on the trial, testified to the formalities of execution as required by law, and in addition swore in part as follows:

S. B. Carter: Knew Mrs. Hunt 35 or 40 years. Had seen her frequently, his office being just across the street from Mrs. Hunt's place of residence. At the time the will was executed Mrs. Hunt was in her room, dressed in a kimono, recognized each witness, and her mind appeared good. "I did not see anything wrong with her mind. I talked some with her; she did not appear to be excited. She wasn't drunk, and she didn't appear to me to be under the influence of any drug or narcotic. The only thing I discovered different in Mrs. Hunt's condition—she seemed to be breathing a little bad—seemed to have some difficulty." She said she was going to make a will, not that she thought she was going to die right away, as she hoped to live 20 years more. She asked if the will was to be read to the witnesses, and Mr. Dunlap told her he would do it if she wished, but it was not necessary; and she said if not necessary it needn't be done, that "she knew what it was," and went ahead and signed it. Did not see anything indicating she did not know what she was doing, and she did not seem excited. "I did not see either liquor or jugs around. I am inclined to think if there had been anything unusual about Mrs. Hunt, or if she had been under the influence of whisky, I don't know but what I would have refused, but I know she was all right. . . She signed the will freely and voluntarily, and at the time she signed it I considered her of sound and disposing mind and memory. . . I didn't see Ed Dunlap take a drink. . . Didn't smell any liquor on him or about there. . . She didn't appear to be at all excited. Henry Washington was as sober as a judge. Dr. Rudolph was all right." The witness denied knowledge of the Oglesby disturbance earlier in the day, as alleged. "If I had known that and found her in the condition she was, I would have thought she had mighty good control of herself."

T. E. Atkins: Had known Mrs. Hunt, and sometimes saw her almost every day. His banking business was across the street from her residence. "I considered her a very intelligent woman and

a very bright woman, above the average." Mrs. Hunt and her husband had been engaged in the banking business, which she continued for a time after Hunt's death. When she signed the will she was of sound and disposing mind. "I didn't see anything wrong, and considered her all right. . . She didn't seem to be different from what I had always known her mentally. She didn't seem excited. . . Nobody did or said anything to her to procure her or to persuade her to sign that will." Mrs. Hunt did not appear to be under the influence of any drug, and witness did not see any evidence of liquor or smell any. "Mrs. Hunt had been engaged in running the hotel shortly before her death. Mr. Hunt ran the bank before he died, but shortly after his death Mrs. Hunt closed that out. I have heard that in running a hotel, frequently drunk men come around. Mrs. Hunt had been used to seeing drunk men, in my opinion."

James A. Rudolph: Had known Mrs. Hunt all his life. "Mrs. Hunt had a remarkable mind, and was a woman of remarkable intelligence." She was of sound mind when she signed her will, and nothing indicated that she was not in full possession of her faculties. "She was not under the influence of any liquor, and I didn't see any evidence of her being under the influence of any opiates or any drugs. She appeared very quiet and calm and just as usual. . . Her talk was just as usual. . . She signed the instrument . . freely and voluntarily, and there was nothing done or said that induced her to sign it. Ed Dunlap was not drunk, and . . Henry Washington was not drunk. . . I didn't see any bottles or jugs all over the room. There wasn't anything of that kind in sight."

The caveators introduced evidence in substance as follows:

Mrs. Aurora Strong McGhee: Had lived with Mrs. Hunt from the age of eighteen to twenty-three, except the time she (witness) was in training as a nurse, being Mrs. Hunt's niece. Mrs. Hunt had witness to come and stay with her after Mr. Hunt died, and after the banking business began to get into trouble Mrs. Hunt had to call in a lawyer, and she secured Mr. Dunlap. Witness heard Dunlap tell Mrs. Hunt he could assure her social position in Gainesville. "Mr. Dunlap brought a half gallon of brandy peaches to her room. . . The first bottle was about half a quart of Scotch whisky." Witness protested that Dunlap evi-

22

dently had no respect for Mrs. Hunt, and would ruin her; whereupon Mrs. Hunt declared she was not going to be a slave to business any longer, but do as she pleased, and contended she needed a stimulant. "I had to undress her and put her to bed more than once after Mr. Dunlap left her at night, on account of her drinking and being tired and worn out. . . I have asked him to stop and not to bring Aunty any whisky, but he wouldn't have much to say and he never did stop, . . and he told me one time that 'Miss Aurora, your Aunty doesn't need a chaperon.' . . Mr. Dunlap advised her to get rid of me, . . because they couldn't do anything with me." Witness frequently saw Mrs. Hunt and Dunlap drinking at the hotel where Mrs. Hunt resided. "It was at one end of the hall that had been screened off in between the library and Aunty's room." When witness remonstrated, Mrs. Hunt told her that drinking was her business and she was going to drink if she wanted to. Mrs. Hunt had not been given to drinking before this time, but now continued it. Witness could have got along with Mrs. Hunt if it had not been for Dunlap. Witness objected to Dunlap's bringing Mrs. Hunt whisky, and took two bottles of whisky away from Mrs. Hunt to keep her from drinking it. "The trouble with Mrs. Hunt and I was whisky— I didn't want her drinking it, and was taking it away from her all the time." Dunlap kept Mrs. Hunt's husband from making a will, because "they were going to turn that money over to the children." Mrs. Hunt had drunk very little whisky during her life. She would not drink corn whisky at all. "She had to have the finest article, and drank a great deal. . . Mr. Dunlap brought whisky there three separate times. He brought Scotch whisky at the same time that he brought the brandied peaches. Then came two times more; these were just the times I saw it and know it, but Aunty was never without it."

Erwin B. Ledford: Knew Mrs. Hunt well. Dunlap requested him to go to Mrs. Hunt's with him, saying Oglesby was up there drunk and cutting up. They went and found Oglesby there drunk. Oglesby threatened Dunlap, and said Dunlap had double-crossed him, and had his knife out, and came at Dunlap, threatening to kill him. "Mrs. Hunt came out to the door and asked Mr. Oglesby to let her have the knife. She wasn't afraid—didn't seem excited at all—stood it better than I did. . . I went back

in Mrs. Hunt's room after Mr. Oglesby was carried out. . . I asked her wasn't she excited, and she says ' No, not a bit;' . . but I was excited. She didn't seem excited at all." Witness was in charge of improvements made on Mrs. Hunt's hotel to extent of about $100,000. Mrs. Hunt took an interest in the work, even going on the roof to inspect it. Witness did not see any liquor around when the Oglesby incident occurred, and noted no evidence of drinking except Oglesby. Mrs. Hunt told witness she intended to give the hotel to Brenau College, and witness suggested letting them take it at once and assume a $6500 loan, and Mrs. Hunt said she would rather give it to them free of debt. She also spoke of the school she wanted to build on the Glades property. ".I was up there Monday and Tuesday afternoon. . . Didn't seem to be anything wrong with her mind that afternoon. She had a heart trouble. . . I never did see anything wrong with Mrs. Hunt's mind; she was about as smart a business woman or man as I ever saw. . . She was as straight as a die with me." Mrs. Hunt said Washington had bought a half interest in one of her farms to help her out on ready money, and she said Ed Dunlap had been kind to her. "She was very positive in all of her business. She was in all that I had to do for her. This woman could plan more between Saturday night and Monday morning than any dozen men I ever saw, and it was done right, and she was that way in every kind of business, and in all that planning she was taking care of Mrs. Hunt."

Mrs. I. R. Banks: Knew Mrs. Hunt the last five years of her life well, and saw her frequently just before her death. Witness went to Mrs. Hunt's the day she signed the will, found Dr. Rudolph, and remonstrated about letting Mrs. Hunt have drugs, and the doctor said she would die, now, if she didn't have them. On seeing witness Mrs. Hunt rushed to her, asking where witness had been. Mrs. Hunt said that since she had lived through that day she would get well, that it had been a terrible day. Mrs. Hunt said they had had a terrible row, words between "Edgar" and Oglesby. Witness tried to calm her. "I should consider her condition, at that time—let me get the right word—in a state of delirium; this was after these gentlemen as witnesses to the will had come out, and I would imagine about one half to an hour, possibly not so long after." Witness was terrified at "eccentric"

manner of Mrs. Hunt. "I would not consider her capable of making a will at any time for a week before her death." Instance above described was on day before Mrs. Hunt's death. She described Mrs. Hunt's laugh as "a foolish sort of giggle." Mrs. Hunt refused to eat, and talked excitedly about the Oglesby matter. Witness had done business with Mrs. Hunt, and considered her a remarkable woman; "and that is the reason that I recognized her lack of normal self at the time I refer to."

Mrs. R. L. Howard: Mrs. Hunt talked "flighty" after returning from hospital in March, 1927, and did not seem natural. "Each visit satisfied me she was growing weaker in body and mind and that she could not live long. . . She talked flighty and out of her head. In my opinion she did not have mental capacity to make a will." Witness was Mrs. Hunt's niece. "I saw her April 12th in her bedroom. She seemed very much upset, and in my opinion was not capable of making a will. She said she had made a will and left us all something. She said, 'They wanted me to make a will, and I have made one, but I am going to tear it up. I forgot my father's people in the will, and left it all to my mother's people,' and then she asked us if we thought that would make any difference. I don't think she had capacity to make a will that day or at any time after her return from the hospital."

Mrs. Launa Trentham, another niece, testified to substantially the same things, with regard to testamentary capacity and the matters forming her opinion, as Mrs. Howard.

C. C. Staton: Is a trustee of the school at Clermont. Mrs. Hunt had talked with him about putting the Glades property in that school as a memorial to her husband. Witness saw nothing wrong with her mind. Homer Gailey testified to substantially the same effect. Romey Savage testified that he had been in charge of the Glades property since Mr. Hunt's death; that he had a business conversation with Mrs. Hunt in her room several days before her death, and her mind appeared normal. J. H. Pitchford testified that he had worked for the Hunts 27 years, and never knew anything wrong with Mrs. Hunt's mind; that he was in Mrs. Hunt's room the day she died; that she was highly fretful, and was protesting that her food was bad, and that she had provided for him and Miss Hulda, and it looked like they would wait on her a little; and that he thought her mind all right.

Mrs. W. R. Swain testified, in depositions taken by caveators but introduced by propounder: "Shortly before Mrs. Hunt's death I went to ride with her on Sunday afternoon. . . She mentioned Mr. Dunlap's name, Mrs. Dunlap and the children. She was very fond of Mr. Dunlap. She had talked about him, in fact, when I worked at the Gainesville Drug Store, and she talked to me about him, and when I worked there in the lobby she has talked to me about loving Ed and Kitty and the children. She said she loved Ed as good as she could her own son, because, she said, 'I was present when he was first born, and was the first person that had him in their arms,' and she says, 'He is as near to me as my own son,' and it was a constant thing that she was talking about him being so good to her. . . In all my transactions with Mrs. Hunt, and meeting up with her and being with her constantly during the latter days of her life, I consider she was a remarkable woman in every way—never saw anything wrong with her mind. . . I didn't see anything at all wrong with her mind. . . She seemed very calm to me in her business matters. She wasn't a woman you could excite easily—if anything happened she was very calm. . . Did not notice any excitement about her voice when she called Monday night about her supper—didn't notice anything wrong or unusual."

Further testimony for propounder was as follows:

O. A. Carter: The last conversation witness had with Mrs. Hunt was about her will. "She said: 'We have decided to make a will; . . we are going to carry out a girlhood dream of mine.'"

J. M. Bell: Mrs. Hunt had talked business affairs with him. "She was a superior business woman. I never did see anything at all that indicated that her mind was not all right."

A. C. Wheeler: "Mr. and Mrs. Hunt outlined a plan in the room, and there stated that they had been talking for some time about establishing a school on this Glades property, and that he wanted to provide in his will that the bulk of the estate would be used for the establishment of a college there for poor mountain boys in North Georgia, so that they might get an education. I told him that a will of that kind, bequeathing more than a certain amount of his estate to a charitable proposition, that if he died within ninety days after the will was made that it would be

void unless his wife consented to it, . . and Mr. Hunt said if it depended on her consent after his death, he'd just let her fix it, he believed. . . Mrs. Hunt was there in the room all the time."

Dr. John B. Rudolph: Was Mrs. Hunt's physician. Was present when the will was signed. "Mrs. Hunt was very quiet and composed and pleasant. She talked pleasantly with the gentlemen present, and said that she wanted to make her will and wanted them to witness it, not because she thought she was going to die, but because she thought it was the thing to do, and she hoped to live many years and enjoy the friendship of her friends and townsmen. . . When these paroxysms of pain were not on her she was very pleasant. This paroxysm of pain was not on her at the time of the signing of this will. . . She talked pleasantly. She said: 'This is my will, and I want you gentlemen to witness it. . . This is my will and what I want done with my property.' There wasn't any sort of influence brought to bear on Mrs. Hunt to get her to execute this will at the time of the signing of the will."

E. B. Dunlap: "This is what I read to her; . . this is the will, read it from commencement to end, and when we had she said, 'I forgot somebody,' and said, 'I want to give that Miss Bowers, Miss Ethel Bowers, and Dr. Rudolph $500 apiece,' and said, 'Can you get that in without rewriting the will?' and I said 'Yes, I will write it on the side, and it will be all right,' and then I wrote that on the side there' and renumbered the paragraphs after that. . . I wrote in the presence of Mrs. Hunt and at her direction. . . How the word "niece" came to get in the will instead of the word "sister" I do not know. . . I went straight to the hotel to Mrs. Hunt's room with this will in my pocket. That is a mistake about the niece part and Sarah Elizabeth Cook. . . I think I made the mistake, or Mrs. Hamilton [his stenographer] made the mistake. . . When I came in the room I said, 'Mrs. Hunt, here are your witnesses,' . . and she said 'How do you do?' . . and then she was sitting up on the bed and made a little speech, and said: 'I am going to make a will, because I want to, and nobody asked me to. . . How many wills have I made, Edgar?' And I said, 'Two or three.' Then she talked to them and went on to state something about

her friends, her institutions, and what she wanted to do with her money."

A copy of a speech made by Mrs. Hunt at a Brenau house party, in which she said: "I have cherished the hope that I might some day be able to contribute something substantial toward this development."

Caveators tendered the chart of Mrs. Hunt while a patient in Downey Hospital, showing some 60 hypodermics of morphine and 17 drinks of whisky administered from March 7, 1927, to March 16, 1927.

Mrs. McGhee, recalled, testified for caveators upon a hypothetical question embracing administration of morphine as the chart showed, the length of the will, the presence of a drunk man when the attorney brought the written copy of the will, the ensuing disturbing language and threats and drawing of a knife, followed by a hurried examination of the document, that it would be hard to say whether Mrs. Hunt could have known what she was doing, but under the circumstances surrounding Mrs. Hunt's entire case, including her extreme illness in the hospital, the witness would not consider her capable of making a will. She also said the mistake about the sister alluded at as "niece" indicated Mrs. Hunt's mind was not in a condition to understand her own kindred.

*Colquitt & Conyers, Dean & Wright, G. F. Kelley, W. B. Sloan, Boyd Sloan, R. P. Jackson,* and *B. F. Whelchel,* for plaintiffs in error.

*J. B. Jones, Wheeler & Kenyon, B. P. Gaillard Jr., W. N. Oliver,* and *E. B. Dunlap,* contra.

GILBERT, J. Wills have always been a fruitful source of litigation. It would be unnatural if one's claim to testamentary benefaction should not weigh heavily in the mind of the claimant, and that an adverse disposition should not seem unreasonable and unjust. Indeed, the latter is calculated in many instances to produce the perfectly honest opinion that the disposition made is convincing evidence that the testator was mentally unbalanced and without testamentary capacity, or that undue influence substituted the will of another for that of the testator. Slight facts assume exaggerated importance, casting suspicion upon very worthy and natural acts and motives. No one may justly complain if a testator, having testamentary capacity, shall freely and voluntarily execute a will

devising or bequeathing his property agreeably to his own wishes alone, if not contrary to law. Civil Code (1910), §§ 3832, 3834, 3838. The very nature of a will requires that it be freely and voluntarily executed. *Pennington* v. *Kerrigan,* 159 *Ga.* 345, 350 (125 S. E. 795).

The testatrix in this case was an aged, wealthy widow. She had no children. With her husband she had been actively engaged in business pursuits for many years, sharing with him the direction and responsibilities of conducting banking and hotel businesses, the ownership and control of extensive farm lands, and apparently other business affairs. Certainly they had together, by close attention and good business judgment, amassed a fortune quite unusual for their day and in their theatre of action. It is clear from the evidence that she had for many years indulged "a dream" of philanthropy; that from the fruits of an active business life she would transmit a blessing to the mountain children of the northern section of her beloved Georgia. The principle of the Christian religion had laid strong hold upon her. Thus she hoped that her life would not have been in vain; that the blessings she had received, that the rich reward which had come to her, through her toil and vision, would live after her. In these "dreams" her husband fully shared. Their plans were jointly made and in perfect accord. Before his death Mr. Hunt, the husband, had expressed a wish to so provide by testamentary disposition of his estate, but, owing to legal complications due to imminent death, he declared to an attorney, in the presence of Mrs. Hunt, after a discussion of the subject with her, that if the validity of leaving more than a certain part of his estate depended upon her consent after his death, he would "just let her fix it." In her will she faithfully carried out the joint plan and purpose. Mrs. Hunt also evidenced in her life and in her will her devotion to Brenau, her alma mater. Her motor-trip of about 500 miles to Florida shortly before her death was in the interest of a Brenau endowment, and the trip doubtless hastened the end of her days. Previously she had been the benefactor of Brenau, and by both speech and performance had evidenced the abode of one of her dreams. Being childless, she had very humanly showered affection upon the child of another, Edgar B. Dunlap. A witness, close friend of Mrs. Hunt, testified: "She mentioned Mr. Dunlap's name, Mrs. Dunlap and the

children. She was very fond of Mr. Dunlap. ‘She had talked about him, in fact. When I worked at the Gainesville Drug Store she talked to me about him, and when I worked in the lobby she has talked to me about loving Ed and Kitty and the children. She said she loved Ed as good as she could her own son, because, she said, 'I was present when he was first born, and was the first person that had him in their arms,' and she says, 'He is as near to me as my own son,' and it was a constant thing that she was talking about him being so good to her."

Another witness testified that on one occasion when Mr. Dunlap approached, Mrs. Hunt declared, "There goes my boy." That Mrs. Hunt called for Dunlap to write her will, remembered his past services, bequeathed bounties to his children for their education, and made provision in her will as recompense for his services, were not indications of mental weakness or of undue influence. It was evidence of her sense of justice and her sentiment of affection which had endured without a break from the very birth of Dunlap, whom she regarded, in her affections, as her own child. Owing to the manifold interests of the Hunts and to the fact that no child, or perhaps because no near relative, was available, Henry Washington generously and freely rendered valuable services. Mrs. Hunt declared that he even purchased farm property from her for which he had no need, but really to place much needed cash in her hands, because it worried her to borrow. If this is true, it was an act of loyal friendship which should have bound her to him with hoops of steel. As to her he was like unto one who "sweareth to his own hurt and changeth not." Whether true or not, it was her belief, and in such circumstances the making of Washington executor of her will was no evidence of mental incapacity or of undue influence. It was an act of gratitude for past favors, by one convinced of Washington's ability because of proved fitness. Much stress is laid upon her bounties to Dunlap and Washington; upon her private interviews with them, to the exclusion of all others, when discussing with them the making of her will. Properly viewed, these acts are consistent with sound judgment and reason. Interviews, such as those mentioned in the evidence, especially with regard to making a last will and testament, would seem to require privacy. The contrary would appear unnatural and unusual, more especially upon the part of an aged

woman, much enfeebled and subject to painful heart attacks. Certainly in the solemn moments when determining the disposition of her property after her death, it was no time for receiving guests whose advice had not been solicited, however close the ties may have been.

It is argued that she drank intoxicating liquors and was addicted to narcotic drugs. As already stated, she was an aged woman, physically weakened by disease. She suffered from high blood pressure, and angina pectoris. Her attacks caused intense pain. Her physician advised her to keep whisky on hand and to use it when necessary. He administered drugs to alleviate her suffering. It is not within the proprieties of this opinion for us to express any view as to the moral or legal aspect of the physician's advice. There is no evidence which would authorize the jury to find that either intoxicants or drugs had rendered the testatrix mentally incapable of making a valid will. Neither would they show undue influence on the part of persons who merely furnished or prescribed them. All of the attesting witnesses and three physicians who knew her and had treated her testified that she possessed an unusually strong mind. The attesting witnesses and one of the physicians swore that she was perfectly sane and calm *at the time the will was executed.* Another physician saw her an hour or two before she died, and swore to her sound mind. Many others who knew her in business and as employees unite in testifying to her sanity. It would be difficult to make a stronger case of complete mental capacity and freedom from the undue influence of others. The caveators introduced Erwin B. Ledford as a witness, and proved by him that he was with Mrs. Hunt just after the Oglesby incident, the day the will was executed, and that he saw no whisky and no evidence of drunkenness except in the case of Oglesby, and that Mrs. Hunt "didn't seem at all excited." He was with her again the next day, the day of her death. He swore: "I never did see anything wrong with Mrs. Hunt's mind; she was about as smart a business woman or man as I ever saw, . . could plan more between Saturday night and Monday morning than any dozen men I ever saw, and it was done right." This witness was in charge of hotel improvements for Mrs. Hunt, to the extent of about $100,000. Caveators introduced C. C. Staton as a witness, and proved that he had known Mrs. Hunt ever since he was a boy

and "never did see anything wrong with her mind." He did not see her "after the day she was operated on." Homer Gailey was sworn by the caveators, and said he had talked with Mrs. Hunt about her plan for endowing an industrial school two or three months before her death; that "she was a woman of very extraordinary mind." The depositions of Mrs. Swain were taken by the caveators, but were introduced by the propounder. She had worked in the hotel owned by Mrs. Hunt, which was Mrs. Hunt's residence. She knew her well, had frequent conversations with her; and shortly before her death witness took an automobile trip with her when she discussed her plans for the future. Mrs. Hunt called witness on Monday night after the will was signed, and the witness saw her several times the next day, which was the day of her death. Mrs. Swain swore: "I didn't see anything at all wrong with her mind. . . She seemed very calm to me in her business matters. She wasn't a woman you could excite easily— if anything happened she was very calm. . . Did not notice any excitement about her voice when she called Monday night about her supper—didn't notice anything wrong or unusual." Thus it is seen that caveators introduced several witnesses whose testimony counteracts the testimony of other witnesses they introduced.

What appears as a conflict consists of the opinions of non-expert witnesses who were not present *at the time* the will was executed; and when the facts upon which these opinions were based are examined, no real conflicts appear. "Where there is no conflict in the evidence, and that introduced with all reasonable deductions or inferences therefrom demands a particular verdict, the court may direct the jury to find for the party entitled thereto." Civil Code (1910), § 5926. Giving to the caveators the benefit of the most favorable view of the evidence as a whole and of the legitimate inferences therefrom, the verdict in favor of setting up the will was demanded. "The mere fact that there are conflicts in the testimony does not render the direction of a verdict in favor of a party erroneous, when it appears that the conflicts are immaterial, and that, giving to the opposite party the benefit of the most favorable view of the evidence as a whole and of all legitimate inferences therefrom, the verdict against him is demanded." *Sanders Mfg. Co. v. Dollar Savings Bank,* 110 *Ga.* 559 (2) (35 S. E. 777);

*Skinner* v. *Braswell,* 126 *Ga.* 761 (2) (55 S. E. 914); *Walters* v. *Walters,* 151 *Ga.* 527, 530 (107 S. E. 492). In the last-cited case, where a physician who had known the testator all of his life testified that the testator had Bright's disease, and that the physician didn't believe "he would be a man of sound mind enough to write a will," this court affirmed the direction of a verdict setting up the will. The test is whether the testator was mentally incapable or was unduly influenced *at the time* the will was signed. *Brown* v. *Kendrick,* 163 *Ga.* 149, 168-9 (135 S. E. 721), and cit. "Undue influence which operates to invalidate a will is such influence as amounts either to deception or to force and coercion, destroying free agency." *Bohler* v. *Hicks,* 120 *Ga.* 800 (5) (48 S. E. 306); *Potts* v. *House,* 6 *Ga.* 324 (50 Am. D. 329); *Thompson* v. *Daville,* 59 *Ga.* 472 (3). Not all persuasion or influence is "undue." *DeNieff* v. *Howell,* 138 *Ga.* 248 (6) (75 S. E. 202); *Burroughs* v. *Reed,* 150 *Ga.* 724 (105 S. E. 290); *Ricketson* v. *Ricketson,* 151 *Ga.* 540, 544 (107 S. E. 522); *Ward* v. *Morris,* 153 *Ga.* 421 (3) (112 S. E. 719).

The will makes numerous bequests to her relatives, while leaving the bulk of her estate to Brenau, her alma mater, and to the University of Georgia, that oldest of chartered State universities, from whose classic halls so many sons have gone forth to shed lustre upon their State. She remembered her church and the Baptist Orphans Home, her physician, her nurse, her business employee, her former maid. She provided for the establishment of six scholarships in Brenau and the University of Georgia for named girls and boys. She devised a large tract of land in Hall County to the University of Georgia, to be used as a memorial to her late "beloved husband, James H. Hunt," upon which there should be established an "Industrial School" for the "mountain boys of North Georgia," or in lieu thereof that the land should be sold and the proceeds used as "a loan fund for worthy North Georgia boys and known as the James H. Hunt Loan Fund." She also provided that two fifths of the residue of the estate be administered by the trustees of said university for the loan fund. To read the will, which heretofore appears in full, is to be convinced that Mrs. Aurora Hunt was not only possessed of a great mind but also of a great heart; that her heart burned to shed the light of education, the power of knowledge, among the girls and boys of north Geor-

gia. Let the light of education, the light of a new day, shine in the mountains. The evidence so demands, and the court did not err in so directing.

*Judgment affirmed. All the Justices concur, except Russell, C. J., disqualified, and Hines, J., dissenting.*

HINES, J., dissenting. After a careful consideration of the evidence in this case, I am of the opinion that the trial judge erred in directing a verdict for the propounders. A trial judge can only direct a verdict "Where there is no conflict in the evidence, and that introduced with all reasonable deductions or inferences therefrom demands a particular verdict." Civil Code, § 5926. It is true that immaterial conflicts do not render the direction of a verdict erroneous. *Sanders Mfg. Co.* v. *Dollar Savings Bank,* 110 *Ga.* 559 (supra); *Skinner* v. *Braswell,* 126 *Ga.* 761 (supra). If, however, there is any conflict in the evidence upon a material issue in a case, the trial judge can not usurp the province of the jury and instruct them to render a given verdict. This section ought not to be extended beyond the plain and literal meaning of its words. *Williams* v. *State,* 105 *Ga.* 814, 816 (32 S. E. 129, 70 Am. St. R. 82). A judge can not properly direct a verdict because he may think that the strength or weight of the evidence is on one side, or because he might grant a new trial if a verdict should be returned against what he thinks is the preponderance of the evidence. *Blackburn* v. *Lee,* 137 *Ga.* 265 (73 S. E. 1). It can not be held that, because the evidence in favor of one party is weak and the evidence in favor of the other party is strong, there is no conflict in the evidence. Such a case falls within this section. *Trotter* v. *McKoy,* 142 *Ga.* 820 (83 S. E. 857).

The probate of the will was caveated upon the grounds that it was executed in consequence of undue influence exercised over the testatrix, and that the testatrix was mentally incapable of executing the same. Certain undisputed facts appear in the record. The scrivener was the counsel and confidential adviser of testatrix. J. Henry Washington was her confidential business adviser, and is the nominated executor of the instrument propounded as her last will. These parties had an engagement to meet in the lobby of the hotel at which the testatrix resided, at ten o'clock on the morning of the day when the instrument was executed, for the purpose of preparing the same. When the scrivener reached the

lobby of the hotel at the time designated, Washington was not there. The scrivener awaited his arrival. Upon the arrival of Washington both went to the room of testatrix, where they were closeted with her alone and visitors were excluded from the room from shortly after 10 a. m. until 1 p. m., when both left the room of testatrix together. The attorney then went to his office to prepare the will. The attorney and the nominated executor were to return to the hotel at four o'clock, when the will was to be executed. At that hour the scrivener went to· the room of the testatrix, expecting to find Washington there. Nothing was done until the latter arrived. The witnesses to ·the instrument were secured by the scrivener and by the nominated executor. · Both the scrivener and the nominated executor were present at the time of the execution of the purported will.

The nominated executor is to receive a bequest of $15,000, under the seventh item of the instrument offered for probate. This item recites the existence of a confidential relationship between testatrix and the nominated executor. By the eighth item of this instrument the scrivener is to receive the sum of $5000. By the thirteenth item the testatrix gives to the two sons of the scrivener the sum of $5000 each, and makes the scrivener trustee of these funds. By the twenty-fourth item the scrivener is appointed attorney for the nominated executor. This item further provides that, irrespective of any legal matters such attorney may have to perform, he is to receive the same commission as is allowed the nominated executor. Thus these parties, who are unrelated by blood or marriage to the testatrix, are to receive larger benefits under the alleged will than all the blood relatives of the testatrix combined. The scrivener and the nominated executor had great influence over the testatrix. The scrivener had previously advised the testatrix to make a will, when she informed him that she had already done so. The will was executed about 4.30 p. m. on April 11, 1927. The testatrix died the next day. She was sixty-eight years of age, at the time the will was executed. She had been a sufferer from angina pectoris from 1914 to the date of her death. The attacks of this disease became more frequent and more distressing during this period. She suffered a severe attack on April 10, 1927, the day ·before the will was executed, when her physician thought she would die. These attacks greatly weakened her. She went to Florida in

the latter part of February, 1927. She was there taken sick. She returned to Atlanta by train on or about March 6, 1927, and her physician was telegraphed to meet her, with a nurse, at Atlanta. He did so, and advised her to go to a hospital in Atlanta, but she went on to Gainesville. She entered a hospital at Gainesville on March 7, 1927, and was operated upon for hernia. From March 7, to March 16, 1927, while in the hospital, sixty hypodermics of morphine and seventeen drinks of whisky were administered to her. She left this hospital on March 24, and returned to her room in the hotel where she lived. She had suffered from high blood-pressure during 1926 and 1927. During the last ten days of her life her physician visited her daily, some times several times a day, and some times at night. During this period the attacks of angina pectoris became more frequent and violent. The nominated executor did not testify on the trial of this case. By the seventeenth item of this instrument the testator bequeathed to her "niece, Sarah Elizabeth Cook, and to each of her children and to each of her grandchildren, the sum of twenty-five hundred dollars each." Testatrix had no such niece, but had a sister by that name, who had died in 1917. The scrivener testified that he did not know how this mistake occurred, but that in his opinion it was due to him or the stenographer to whom he dictated the terms of this instrument. Shortly before the will was executed some one called the physician of the testatrix, and told him to go to the hotel where testatrix resided, at once. He went at once to the lobby of the hotel and was asked by one Ledford if he had been called to the room of testatrix. He replied in the negative, when Ledford told him to go to her room at once. He was present when the will was executed. He was likewise a legatee under the instrument propounded for probate.

The jury was authorized to find the following facts: The scrivener had assured the testatrix, after the death of her husband, that he could secure her social position in the city of her residence. He furnished the testatrix with intoxicating liquors. The niece of testatrix requested him not to furnish testatrix with such liquors. He replied that testatrix needed no chaperon. He advised testatrix to get rid of this niece, who had been residing with her, and this was done. This niece frequently saw testatrix and the scrivener drinking at the hotel where she resided. This niece

more than once; had to undress and put the testatrix to bed after the scrivener left, because of her drinking, and because of the fact that she was tired and worn out. Testatrix drank a great deal. She was never without intoxicating liquor. The scrivener supplied testatrix with it all the time. Whisky was found in her bathroom right after her death. On the afternoon of the day when this instrument was executed, Mrs. Banks visited the testatrix. When she got there she found the physician of testatrix sitting in the hall into which the room of the testatrix opened. This excited her very much. She then asked the doctor if testatrix was worse, and he said, "No, possibly some better." She then asked the doctor if she could go in to see the testatrix, and he said no, no company. Hearing something, she asked the doctor if the testatrix was busy, and he said, "In conference." She then said to the doctor, "Will you never see the necessity of keeping people away from her and keeping them out of her room when she is sick?" As others were in the room, she knew she could go into see her soon. She waited in the hall, ·talking to the physician, and said to him, "When will you get her off these narcotics?" And she said to him, "I have asked you so many times not to give them to her," that she didn't want them given to her at all, and he replied that he thought she needed them then, and if she didn't have them she would die. Witness stayed there a few minutes, when the scrivener came out of the room, and said to the doctor, "I will be back in a minute." When the scrivener left she started toward the door, and just as she did she heard a voice in the room. She waited again a few minutes, when the scrivener came back with the witnesses who attested the will. She then left the hotel. She returned, and as she came back in the hotel the physician was going out. She said, "May I go up to her room now?". He said, "Yes," in a most unwilling manner. Witness went to the room of testatrix, knocked and opened the door and went in, when the testatrix rushed to her and said, "Where have you been, where have you been?" in a most distracted manner. Testatrix said, "Darling, Oh, I have had a most terrible day. If I have lived through this day, I know that I am going to get well." Witness said, "My darling, I am sorry, don't talk now, and eat your supper." Testatrix said, "You have got to listen to me, and listen to what I say." "I have had a most

terrible day." She then told of one Oglesby coming to her room in the morning, drunk, and of a row between him and the scrivener. This witness testified that the testatrix was then in a state of almost delirium. This was one half to an hour after the witnesses to the will had come out of the room of testatrix. Witness testified that from the remarks of the testatrix she would not consider her capable of making a will at any time that afternoon. When this witness opened the door of testatrix, the latter's hair was torn down and disheveled. The testatrix was accustomed always to keep herself tidy and neat. Witness had seen the testatrix two or three times a day since her return from the hospital. Testatrix had not been herself. She knew that testatrix had had a perfect memory, but she would fail to remember words, and things she wanted to tell the witness, and had been that way since her return. This witness testified: "In my opinion I would not consider her capable of making a will at any time for a week before her death." This witness testified that testatrix was not in a condition to transact any business from the time she went to Florida. She further testified that in her opinion testatrix was to a degree under the influence of a more or less powerful drug the afternoon the instrument was executed.

Mrs. Howard, a niece of testatrix, testified that she visited her aunt at the hospital after she had been operated upon on March 9, 1927. Testatrix told her that the operation was for an old rupture which had taken place a good many years before. She found testatrix in a very weak condition both physically and mentally. Her mind was very weak and unbalanced, and she seemed doped or suffering from mental prostration. She went again to see testatrix, but the nurse would not let her see her aunt, stating that she was not allowed to have company. Testatrix returned from the hospital about March 23, or 24, 1927, and went to her room in the hotel. She saw testatrix on Saturday, March 26, after her return from the hospital, and found her condition very much worse. She was very weak in body, though she could walk some in her room, but she kept in bed most of the time. She did not seem natural or like herself. It was very clear that her mind was failing, and she talked and acted strangely. She had fallen off greatly in flesh, and looked very bad. Her talk was flighty and rambling, and she cried at times. She saw testatrix

nearly every day, and some times twice a day. Each visit satisfied her that testatrix was growing weaker in body and mind, and that she could not live very long. At times her body, feet, and hands were terribly swollen. She talked flightily and out of her head. This witness testified: "In my opinion she did not have mental capacity to make a will. . . Her mind was just practically gone. During each visit it got worse and worse, at times in stupors, and at other times flighty. . . Saw her on Saturday, April 9, and she was worse than the day before, and she was not able to reason or understand the nature of a will, or to have an idea as to the disposition of her property, in my opinion." This witness saw her on April 12, 1927, in her bedroom. She testified that she seemed very much upset, and in her opinion was not capable of making a will. She said she had made her will and left us all something. She said, 'They wanted me to make a will, and I made one, but I am going to get hold of it and tear it up—I forgot my father's people in the will, and left it all to my mother's people,' and she then asked us if we thought it would make any difference. I did not think she had the capacity to make a will that day, or any time after her return from the hospital.

Mrs. Laura Trentham, another niece of testatrix, testified that testatrix was operated upon for hernia at the Downey hospital, that she visited her in the hospital. She found her in a very weak physical and mental condition, and her mind was very weak and unbalanced. She seemed to be doped or suffering from mental prostration. She later visited her, and was refused permission to see her, because she was not allowed to see company. She testified that testatrix returned from the hospital on March 23 or 24, 1927, and went to her room and occupied this room until her death. She saw testatrix the day of her death, and she seemed very weak in body, but could walk around; her mind was weak, and she talked flighty, and it was clear to witness that the mind and strength of testatrix were failing fast. She seemed very weak and upset, and in the opinion of the witness testatrix was not capable of making a will. Testatrix stated to this witness that she had made a will and was not satisfied with it, and she intended to get hold of it and destroy it. Her mind seemed to be wavering, and she seemed flighty. This niece thought that testatrix was under the influence of some strong dope.

The subscribing witnesses testified that the will was freely and voluntarily executed by the testatrix, and that she was mentally capable of executing it, she being a woman of fine intelligence and good business capacity. Three medical experts testified that she was mentally capable of making the will. There were other witnesses who testified that the testatrix was a woman of fine intelligence and excellent business capacity. The scrivener testified that he wrote this will in accordance with instructions given him by the testatrix, that he read over the will to her, that she knew its contents and expressed her satisfaction therewith, and that he did not induce her to make the same.

In these circumstances was there any issue of fact to be passed upon by the jury? In the first place, was there any issue of fact upon the question of undue influence? The presumption is strong against the party preparing a will, who takes a benefit under it; and although it will not be declared void on that account, strong evidence of intention in such case will be required. *Beall* v. *Mann*, 5 *Ga.* 456 (2). Where one who writes a will takes a large interest under it, and he is a stranger to the blood of the testator, the presumption of law is that the testator, although signing the will, does not know its contents. The onus, then, is upon him who propounds the will, to rebut and overcome this presumption by showing that the testator does know the contents of the will. *Hughes* v. *Meredith*, 24 *Ga.* 325 (71 Am. D. 127). When a will was prepared by one who takes a large benefit under it, it can not be set up without strong proof that the testator understood its provisions and assented to them. *Adair* v. *Adair*, 30 *Ga.* 102. "The presumption is strong against an act done by the agency of the party to be benefited, especially when the capacity of the testator at the time the will was executed was in any degree doubtful." *Davis* v. *Frederick*, 155 *Ga.* 809, 817 (118 S. E. 206). "Where a will is written or drafted by a person who takes a lagacy or devise thereunder, a presumption of undue influence is created, which he has the burden of rebutting; and this is especially true where the beneficiary writing the will also occupies a confidential relation to the testator.'- 40 Cyc. 1153. "Incapacity opens the door to undue influence, and when opportunities for such influence are shown, and the favored devisees are the beneficiaries of a will unnatural in its provisions, to the exclusion of others

having equal claims at least upon his bounty, very slight circumstances are sufficient to make the question of undue influence one for the jury." Walls *v.* Walls, 30 Ky. L. Rep. 948 (99 S. W. 969). It is not necessary that there be direct proof of fraud or undue influence. Such proof can seldom be produced. It is competent for the court to submit to the jury all of the circumstances covering the execution of the will; and where it appears that confidential relations existed, as in this case, between the testatrix and the scrivener and the nominated executor of the will, it is for the jury to determine from all the evidence before it whether or not the execution of the will was the result of improper inducement or fraud. *Davis* v. *Frederick,* supra; *Penniston* v. *Kerrigan,* 159 *Ga.* 345, 350 (125 S. E. 795); Hagerty *v.* Olmstead, 39 App. D. C. 170. If an attorney draws a will under which he takes a substantial benefit, a presumption of undue influence arises. Boyd *v.* Boyd, 66 Pa. 283, 294; Abbott *v.* Church, 288 Ill. 91 (4 A. L. R. 975, 123 N. E. 306). By parity of reasoning a presumption of undue influence arises against Washington. It is generally held that when a will is executed through the intervention of a person occupying a confidential relation towards the testator, whereby such person is the executor and a large beneficiary under the will, such circumstances create a strong suspicion that an undue or fraudulent influence has been exerted, and then the law casts upon him the burden of removing the suspicion by offering proof showing that the will was the free and voluntary act of the testator. Watterson *v.* Watterson, 1 Head (Tenn.), 1; Maxwell *v.* Hill, 89 Tenn. 584 (15 S. W. 253); Coghill *v.* Kennedy, 119 Ala. 641 (24 So. 459); In re Everett's Will, 153 N. C. 83 (68 S. E. 924); In re Nutt's Estate, 181 Cal. 522 (185 Pac. 393); Gaither *v.* Phillips, 199 Ala. 689 (10) (75 So. 295); Smith *v.* Smith, 174 Ala. 205 (56 So. 949); Hagerty *v.* Olmstead, supra.

"Where a person who initiated, or directly or indirectly participated in, the preparation or execution by the testator of a will in which he was named a beneficiary, occupied at the time relations of confidence with testator, the proponent of the will had the burden of proving that the will was not induced by coercion or fraud, directly or indirectly exercised by such person, and, where the will was procured through the undue influence of such person, the undue influence operated against all the beneficiaries." Smith

*v.* Smith, supra; Gaither *v.* Phillips, supra. In the case at bar the scrivener was the confidential attorney and adviser of the testatrix, and is given a substantial bequest. And Washington, the confidential business adviser of the testatrix, is given a substantial legacy of $15,000, is the nominated executor of the will, and took an active part in securing its preparation and execution. In these circumstances the law presumes that this instrument was procured by undue influence or fraud on the part of the scrivener and executor, and the burden is upon them to rebut this presumption. Whether this burden was carried by the propounder, by introducing evidence to overcome the presumption, is a question of fact to be passed upon by the jury. The trial judge can not determine this question, and the direction of a verdict ·under the circumstances was a usurpation of the province of the jury.

Was there an issue of fact as to the mental capacity of the testatrix to execute this will? Three witnesses for the caveators testified that in their opinion the testatrix did not possess sufficient mental capacity to make a will. Two of these witnesses were nieces of the testatrix, and the other a disinterested witness. All three witnesses gave the reasons for their opinions that the testatrix did not possess sufficient mental capacity to make a will. Mrs. Howard, a niece of the testatrix, testified that testatrix did not have the capacity to make a will at any time after her return from the hospital. She stated the facts on which she based this opinion, and these facts are set out above. Mrs. Trentham, another niece of the testatrix, testified that in her opinion the testatrix was not capable of making a will on Tuesday, April 12, when she saw her in her bedroom at eleven o'clock in the morning, nor at any time when she saw her after she came back from the hospital. She gave the facts upon which she based this opinion, and these facts are set out above. Mrs. Banks, a disinterested witness, testified that in her opinion the testatrix was incapable of making a will at any time for a week before her death. The facts on which she based this opinion are fully set out above. Where witnesses state the appearance, conduct, conversation, or other particular facts from which the state of testator's mind may be inferred, they can express their belief or opinion upon his mental capacity, as the result of those facts. *Potts* v. *House, 6 Ga.* 324 (supra). Where the issue is devisavit vel non, the witnesses, whether attest-

ing the will or not, may give their opinion as to the testamentary capacity of the deceased, provided it is accompanied with the facts as to the conduct, conversation, or condition of the deceased, upon which the opinion rests. *Walker* v. *Walker,* 14 *Ga.* 242 (8). Where a witness states how the testator appeared and acted, the last time he saw him, describes his manner and conversation, and then gives his opinion from the facts stated, this opinion is admissible. *Dennis* v. *Weekes,* 51 *Ga.* 24. Witnesses who stated that they knew the grantor, saw her, and heard her talk, could state their opinions as to her sanity, based on such facts; it being for the jury to determine whether such reasons were satisfactory. *Frizzell* v. *Reed,* 77 *Ga.* 724 (5). "It is well settled that a non-expert witness may give his opinion as to the sanity of another person, based upon his acquaintance with him and the manner, appearance, and conduct of such person during the time that the witness has known him." *Glover* v. *State,* 129 *Ga.* 717 (5) (59 S. E. 816); *Harris* v. *State,* 155 *Ga.* 405 (4) (117 S. E. 460); *Compton* v. *Porterfield,* 155 *Ga.* 480 (117 S. E. 464); *Dyar* v. *Dyar,* 161 *Ga.* 615 (131 S. E. 535). The sufficiency of the reasons of the witnesses for their opinions is not a question for the court, but for the jury, in estimating the weight to which the opinions are entitled. *Gray* v. *Obear,* 59 *Ga.* 675; *Central Railroad* v. *Senn,* 73 *Ga.* 705; *Frizzell* v. *Reed,* supra; *Blackman* v. *State,* 80 *Ga.* 785 (7 S. E. 626); *Hubbard* v. *Rutherford,* 148 *Ga.* 238 (96 S. E. 327); *Pennington* v. *Perry,* 156 *Ga.* 103 (9), 105 (118 S. E. 710).

In view of the familiar principles of law above stated, the conclusion seems inevitable that there is conflict in the evidence in this case upon the issues raised by the caveat. Witnesses who had known testatrix for many years, who had observed her appearance and conduct, and who had heard her talk, testified that in their opinion she was mentally incapable of making a will. The facts upon which these opinions were based are given. In the cases referred to above this court has held that these facts authorized the witnesses to give their opinions based thereon; and that the weight to be given these opinions was a matter for the jury, and not for the court. Thus we have competent opinions based upon competent facts. In these circumstances it must be held that there is conflict in the evidence; and this is especially

true when these opinions, with the facts on which they are based, are weighed with other facts appearing in the record. The testatrix was of advanced age. She had been suffering from attacks of angina pectoris for a number of years. These attacks had become more frequent and violent during the latter years of her life. She had had a very serious attack the day before this instrument was executed. The physician testified that he expected her to die from these attacks, and that these attacks greatly reduced her strength. She had been at a hospital and had undergone a serious operation a little more than a month before she died. For ten days preceding her death her physician had attended her daily, and some times as much as three visits a day, and some times he attended her at night. This indicates the seriousness of her last illness. The evidence authorized a finding that she was addicted to the use of drugs, and that her physician had stated the day her will was executed that in his opinion she would have to have hypodermic injections of morphine to prevent her from dying. So when we take the opinion of the witnesses, based upon given facts, and consider the above and other circumstances which appear in the record, it seems impossible to arrive at the conclusion that there was no conflict in the evidence relating to the issues raised by the caveat in this case. This being so, the trial judge erred in directing a verdict. *Wood* v. *Bellamy,* 154 *Ga.* 431 (114 S. E. 579). So I feel compelled to dissent from the opinion of the majority in this case.